W. D. HADEN CO. v. COMMISSIONER OF
INTERNAL REVENUE.
No. 11948.

Circuit Court of Appeals, Fifth Circuit.
Jan. 23, 1948.

Bleecker L. Morse, of Galveston, Tex., for petitioner.

I. Henry Kutz, Sewall Key, George A. Stinson and Helen R. Carloss, Sp. Assts. to Atty. Gen., Theron L. Caudle, Asst. Atty. Gen., J. P. Wenchel, and Claude R. Marshall, both of Washington, D. C., for respondent.

Before SIBLEY, HOLMES, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

In redetermining income and excess profits taxes of W. D. Haden Company for 1940 and 1941, five claimed deductions were disallowed by the Tax Court which are the subjects of this petition for review. The primary facts found are not disputed, and will be stated briefly as to each controversy.

1. Highland Farms Transaction. In October, 1931, the taxpayer, conducting a business of selling building materials and oyster shells, had advanced Highland Farms Corporation a total sum of $29,116. The Corporation assigned eighty-nine land sales contracts to secure the debt. On Jan. 19, 1932, in settlement of the debt the Corporation deeded 123 lots and farm tracts in its subdivision subject to a mortgage, and three notes secured by a second lien on certain properties. The lands and lots for which the eighty-nine sales contracts were first assigned were among those deeded in the settlement, and the title to the lands was subject to the sales contracts and the outstanding mortgage and the mortgage provisions for releases as lots were paid for. The total of the sales contracts was $46,785, and the total of the sums to be paid the mortgagee for releases of the lots sold was $19,175, leaving a net face value of $27,610. Nearly all the sales were on a basis of $200 per acre, payable in installments of $10 per month per acre, and were dated over a period of six years. The mortgage went into default and foreclosure was begun May 28, 1932. Esteeming that it had a loss measured by the original debt of $29,116 the taxpayer so reported in its tax return for 1932, but obtained no tax benefit because it owed no tax anyhow.

There was a cross-action against the mortgagee, however, which after litigation resulted in 1935 in a total defeat of the mortgage. The taxpayer in that year restored the charge-off to its income less $1,019 collected meanwhile, that is to say it set up on its books a new basis of $28,097. The year 1935 was also a loss year, so that no tax was paid in consequence. During the next six years, through 1941, collections on the sales contracts and new sales were made to the amount of $8,231 and applied against said $28,097 basis, reducing it to $19,865. On December 19, 1941, the taxpayer sold all the remaining contracts and lands to Highland Farms Corporation for $9,250 in cash, and claimed a deduction in its tax return of $10,615 as a long term capital loss. The Commissioner disallowed it.

The Tax Court held the original basis was not the original debt of $29,116, but the fair market value of the lands and sales contracts when acquired, and that they were not to be valued as an aggregate, but each item separately; that if the sum of the values was less than the debt paid the difference would have been a bad debt to be charged off in 1932 if not collectible; that there was no appraisement of these properties when acquired in 1932 or since; and there was no testimony as to market values except that the values were equal to the list prices at which the sales were made. The Tax Court then says that on that basis the difference between the aggregate of sales contracts and the payments due to the mortgagee for releases was $27,610 and not $29,116. We are not sure that this last conclusion follows, because as we understand the facts there were unsold lots and lands transferred in 1932, and so not represented in the then aggregate of sales contracts. Their value would have to be added. The Tax Court also held that the sales contracts and the list prices on which they were based are installment prices and so do not represent cash values, but must be discounted, and because what was left in 1941 was resold for about fifty percent of face value that the basis in 1932 ought to be discounted fifty percent. We do not think this is a logical inference, because it is not found that the sales contracts bore no interest and it is found that while the rem-

nant of them was closed out at a discount of about fifty percent, the Highland Farms Corporation later collected $29,000 on them, or nearly three hundred percent of the amount the Corporation paid for them. It seems to us that the sale in 1941 is shown probably to have been below value and is no yardstick to measure the values in 1932. The final conclusion was that no basis for computing loss had been furnished, and that the claimed basis of $29,116 could not be sustained. The latter conclusion we could not say is wrong, for $29,116 is the original debt and not the market value of the property which was acquired for it in 1932, nor is it shown that the debt was worth its face when settled. It is also clear that if the sales contracts drew no interest they ought to be discounted according to the prevailing rates of interest to find their then value. That is a matter of law. But we do not think that because an appraisement was not made in 1932, or because neither side asked the witness as to value to figure out this discount, the court is excused from doing it. Law and justice require either that the Tax Court should figure it out for itself, or having announced that this must be done to arrive at a proper value, should reopen the hearing that the taxpayer may supply the omission. As to this item we set aside the disallowance and direct. that the hearing be reopened for further evidence. There seems to be also a question as to whether certain collections made were returns of capital or income. This also may be further explored.

■ 2. Harrisburg Depot Transaction. Briefly stated, taxpayer owned lot No. 16. The adjoining lot No. 15 was owned by one Beeley. Another lot No. 17 was owned by Texas Company. All had water frontage. One Goodwin, an independent real estate man, offered to get an exchange of No. 16 for No. 17, if taxpayer would pay him a commission of $750. Taxpayer declined the offer, but offered to trade with him even. Goodwin then on his own account made arrangements with Texas Company to buy lot 17 for $7,600, and to ·sell to Beeley a part of lot 16 for $7,800. Beeley later agreed to purchase of Goodwin the remainder of lot 16 for $3,000. All these trades were made in writing in Good-

win's name. The only contract signed by taxpayer was with Goodwin, agreeing to exchange No. 16 for No. 17 with no money consideration. When it came to making the deeds, instead of Goodwin taking Beeley's money and buying of Texas Company lot 17 and deeding it to taxpayer, and taking taxpayer's deed to No. 16 and then deeding it to Beeley, he requested Texas Company to convey No. 17 to taxpayer and taxpayer to convey No. 16 to Beeley, which was done. The Tax Court correctly held that the taxpayer had exchanged its lot for other property of like kind, and had made no money sale, and that under Internal Revenue Code, § 112(b) (1), 26 U.S.C.A. Int.Rev.Code, § 112(b) (1), the transaction had no tax consequence and realized no loss on No. 16, but that No. 17 took the cost basis of No. 16. Goodwin could bind himself to exchange property he did not own but could acquire. Howell Turpentine Co. v. Commissioner, 5 Cir., 162 F.2d 319. Taxpayer simply carried out the contract it had made with Goodwin by conveying at Goodwin's direction to another. Taxpayer did not sell to Beeley or get any of his money. It exchanged its lot for another one.

■■ 3. Williams Gravel Deposit. We need not state fully the somewhat complicated facts. Taxpayer in 1929 acquired a lease on certain gravel producing lands. In 1930 and 1931 taxpayer acquired the title of six of the seven lessors, and in 1939 acquired the seventh interest by a partition. In 1940 taxpayer moved. its machinery onto the forty-seven acres partitioned to it, and worked the pits till January, 1941, and then made a lease to another · company which operated till July 5, 1941. This lease made no reference to the old lease of 1929, and had different terms, conditions and royalties. The lease was surrendered July 5, 1941, because the mining was found unprofitable, and no gravel has been mined since. On Dec. 16, 1941, taxpayer sold the fee title for $329. Taxpayer had carried on its books the cost of the old lease, crediting gravel extracted, and separately the cost of the acquisition of the fee at $2,400. The balance on July 5, 1941, on the lease account was $39,668. The taxpayer claimed a capital loss of $2,400

less $329 on the fee investment, and an ordinary loss of $39,668 by abandonment of the gravel. The Tax Court held that it was all a capital loss, taxpayer's interest in the gravel under the old lease having merged into its title to the fee when that was acquired. A merger would have been prevented only by a clear intent to preserve the lease from merger. 19 Am.Jur., Estates, Secs. 135, 136. No such intent is expressed in any document. Taxpayer after acquiring the title made a new and independent gravel lease as owner. It worked the pits itself. The lease that was abandoned in 1941 was taxpayer's independent lease, and not an assignment of the old one. There was nothing to prevent the usual merger of all lesser interests into the fee. What was sold in 1941 was the land, gravel and all, and the loss realized was a long term capital loss.

**4. Tax Liability against Haden Company.** In 1937 the taxpayer merged with another corporation, the Haden Company, agreeing to acquire all its assets and to assume all liabilities, either actual or contingent, as of April 30, 1937. The known liabilities had been accrued and set forth in a balance sheet, but there was no warranty that they were all. In October, 1937, a deficiency in taxes of Haden Company for the year 1935 was asserted, and after litigation was sustained in part. Haden Co. v. Commissioner, 5 Cir., 118 F.2d 285. In 1941 taxpayer paid up the deficiency adjudged with interest, and costs of litigation, and claimed deductions for the amount paid and its legal expenses as business losses. The Tax Court held, on the authority of Holdcroft Transportation Co. v. Commissioner, 8 Cir., 153 F.2d 323, that the payment of this deficiency, though an unknown liability of the Haden Company, was like the payment of the known liabilities, a capital expenditure in the non-taxable merger, to be considered at an appropriate time as such, but not a business loss in 1941 of the taxpayer. The interest accrued on the deficiency prior to the merger was held part of the assumed liability, but that accruing since was allowed as interest paid by taxpayer. The legal expenses were also allowed as deductions, having been incurred directly by the taxpayer in its own defense, though litigating in the name of The Haden Company. All these holdings we affirm.

**5. Haden Lime Company Transaction.** Taxpayer in 1930 built a lime making plant at a cost of over $300,000, found it could not operate it under its charter, organized the Haden Lime Company and conveyed the plant to it for its entire issue of $300,000 of preferred stock. The no-par common stock was owned ninety-three percent by W. D. Haden, C. R. Haden and W. A. Wansley, who owned all the common stock of taxpayer. In 1941 these persons were the majority of the board of directors of both companies. The Lime Company had operated under a patent which was held invalid. Its operations, moreover, had been at a loss, taxpayer making necessary advances for which in December, 1941, a balance of $82,019 was owing. About Dec. 18, 1941, the Lime Company received an offer for the purchase of its plant for $60,000, or the entire capital stock for $70,000. On that date taxpayer's directors met and decided not to sell all the stock because it would carry with it the name Haden. On Dec. 26, 1941, the directors of both companies met and passed resolutions. The Lime Company resolved that the $60,000 to be paid for the plant be paid over to taxpayer in redemption of the preferred stock of $300,000, there being sufficient cash and liquid assets to satisfy all common creditor's claims with the exception of the past due account owing to the taxpayer, and two liquidating trustees were named, C. R. Haden being one, to take over the cash and choses in action for a complete liquidation of the Lime Company within thirty days, by paying the other common creditors, and delivering the surplus to taxpayer on its open account. The resolution of the taxpayer's directors was simply to accept the proposal of the Lime Company to redeem the $300,000 of preferred stock for $60,000. The Lime Company sold its plant for $60,000 cash, paid off the common creditors other than taxpayer and had, besides the $60,000 from the sale, $60,043 in cash, receivables and inventory on hand, all of which were turned over to taxpayer. The

592

Lime Company surrendered its charter and was dissolved on Dec. 31, 1941. Taxpayer thus received $120,043 from the Lime Company, applied $60,000 to the preferred stock and surrendered it, applied $60,043 to its open account, leaving $21,976 unpaid, and then charged off this balance as a bad debt and claimed a deduction for it.

The Tax Court held that by the liquidation of the Lime Company the taxpayer sustained a large long term capital loss on the preferred stock, but that it did not sustain any bad debt loss one hundred percent deductible, because the debt was collectible ahead of the preferred stock and the money received ought to have been so applied. This conclusion we affirm. There was no real arm's length dealing. Everything was dominated and done by C. R. Haden, W. D. Haden, and W. A. Wansley, who owned the taxpayer. They decided to sell out and liquidate the Lime Company, and how the assets should be applied. The ordinary rule of liquidation, and that fixed by the preferred stock itself, was that all debts be first paid, then the preferred stock, and then the common stock. They knew the common stock was worthless, and there were not assets enough to pay the debts and to retire the preferred stock even at $60,000. The taxpayer must take a large loss. If taken on the preferred stock it would be a capital loss deductible from the year's income only in part. If any of the loss were of the debt, it would be a loss deductible in whole. The latter course was elected. It is not a case whereby in an independent transaction preferred stock was redeemed and thereafter there was a liquidation. It was all done at once, and as a part of the process of liquidation. The debt was ahead of the preferred stock as to all assets. There was enough to pay it in full, and it was not uncollectible, and could not be charged off as worthless. The redetermination of this item we uphold.

The decisions of the Tax Court are accordingly affirmed except as to the Highland Farms transactions. As to them the decision is set aside, and the hearing directed to be reopened for further evidence and a redetermination.

Reversed in part.