Franklin B. BIGGS, Petitioner–Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

No. 78–3361.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1980.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Section, Crombie J. D. Garrett, Murray S. Horwitz, Tax Div., Dept. of Justice, Stuart E. Seigel, Chief Counsel, I.R.S., Washington, D. C., for respondent–appellant.

Miles & Friedman, Louis F. Friedman, Don M. Zimmerman, Baltimore, Md., for petitioner–appellee.

Before BROWN, HENDERSON and SAM D. JOHNSON, Circuit Judges.

HENDERSON, Circuit Judge:

The Commissioner of Internal Revenue appeals from the decision of the United States Tax Court holding that a transfer of real property effected by the taxpayer, Franklin B. Biggs, constituted an exchange within the meaning of § 1031 of the Internal Revenue Code of 1954. We affirm.

The numerous transactions which form the subject of this suit are somewhat confusing and each detail is of potential significance. Thus, it will be necessary to recount with particularity the facts as found by the Tax Court.

Biggs owned two parcels of land located in St. Martin's Neck, Worcester County, Maryland (hereinafter referred to as the "Maryland property"). Sometime before October 23, 1968, Biggs listed this property for sale with a realtor. The realtor advised Biggs that he had a client, Shepard G. Powell, who was interested in purchasing the property.

Biggs and Powell met on October 23, 1968 to discuss Powell's possible acquisition of the Maryland property. Biggs insisted from the outset that he receive real property of like kind as part of the consideration

for the transfer. Both men understood that Biggs would locate the property he wished to receive in exchange, and Powell agreed to cooperate in the exchange arrangements to the extent that his own interests were not impaired.

On October 25, 1968, Biggs and Powell signed a memorandum of intent which provided, in pertinent part, the following:

I. PURCHASE PRICE: $900,000 *NET* to SELLERS.

\* \* \* \* \* \*

c. $25,000.00 down payment at signing of contract, \* \* \*

d. $75,000.00 additional payment at time of settlement, which shall be within ninety (90) days after contract signing, making total cash payments of $100,000.00.

II. MORTGAGE:

a. Balance of $800,000.00 secured by a first mortgage on Real Estate to SELLERS at a 4% interest rate; 10 year term.

\* \* \* \* \* \*

The memorandum contained no mention of the contemplated exchange of properties. Upon learning of this omission, Biggs' attorney, W. Edgar Porter, told Powell that the memorandum of intent did not comport with his understanding of the proposed transaction. Powell agreed to have his attorney meet with Porter to work out the terms of a written exchange agreement.

Biggs began his search for suitable exchange property by advising John Thatcher, a Maryland real estate broker, of the desired specifications. Subsequently, Biggs was contacted by another realtor, John A. Davis, who had in his inventory four parcels of land located in Accomack County, Virginia, collectively known as Myrtle Grove Farm (hereinafter referred to as "the Virginia property"). Biggs inspected the property, found it suitable, and instructed Davis to draft contracts of sale.

As initially drawn, the contracts named Biggs as the buyer of the Virginia property. However, at Porter's suggestion, they were modified to describe the purchaser as "Franklin B. Biggs (acting as agent for syndicate)." The contracts were executed on October 29th and 30th, 1968, and contained the following terms:

| | |
|---|---|
| Paid on execution of contract | $ 13,900.00 |
| Balance due at settlement | 115,655.14 |
| Indebtedness created or assumed | 142,544.86 |
| Total — Gross Sales Price | $272,100.00 |

Upon signing the contracts, Biggs paid $13,900.00 to the sellers of the Virginia property.

Because Powell was either unable or unwilling to take title to the Virginia property, Biggs arranged for the title to be transferred to Shore Title Company, Inc. (hereinafter referred to as "Shore"), a Maryland corporation owned and controlled by Porter and certain members of his family. However, it was not until December 26, 1968 that the purchase was authorized by Shore's board of directors. On January 9, 1969, prior to the transfer to Shore, Biggs and Shore entered into the following agreement with respect to the Virginia property:

1. At any time hereafter that either party hereto requests the other party to do so, Shore Title Co., Inc. will and hereby agrees to convey unto the said Franklin B. Biggs, or his nominee, all of the above mentioned property, for exactly the same price said Shore Title Co., Inc. has paid for it, plus any and all costs, expenses, advances or payments which Shore Title Co., Inc. has paid or will be bound in the future to pay, over and above said purchase price to Shore Title Co., Inc., in order for Shore Title Co., Inc., to acquire or hold title to said property; and it [is] further agreed that at that time, i. e.,—when Shore Title Co., Inc. conveys said property under this paragraph and its provisions, the said Franklin B. Biggs, or his nominee will simultaneously release or cause Shore Title Co., Inc. to be released from any and all obligations which the latter has created, assumed or become bound upon in its acquisition and holding of title to said property.

2. All costs for acquiring or holding title to said property by both the said

Shore Title Co., Inc. and Franklin B. Biggs, or his nominee shall be paid by the said Franklin B. Biggs, or his nominee at the time of transfer of title under paragraph numbered 1 hereof.

On or about the same date, the contracts for the sale of the Virginia property were closed. Warranty deeds evidencing legal title were delivered to Shore by the sellers. Biggs advanced to Shore the $115,655.14 due at settlement and, by a bond secured by a deed of trust on the property, Shore agreed to repay Biggs. Shore also assumed liabilities totalling $142,544.86 which were secured by deeds of trust in favor of the sellers and another mortgagee. Biggs paid Thatcher's finder's fee and all of the closing costs.

On February 26, 1969, Shore and Powell signed an agreement for the sale by Shore of the Virginia property to Powell or his assigns. Payment of the purchase price was arranged as follows:

Upon execution of the agreement $ 100.00

Vendee assumed and covenanted to pay the following promissory notes, all secured by deeds of trust on Virginia property:

| | |
|---|---|
| To Shore Savings & Loan Association | 58,469.86 |
| To those from whom Shore acquired the Virginia property | 84,075.00 |
| To Franklin B. Biggs | 115,655.14 |
| Balance due at settlement | 13,900.00 |
| Total purchase price | 272,200.00 |

The next day, February 27, 1969, Biggs and Powell executed a contract which provided that Biggs would sell the Maryland property to Powell or his assigns upon the following terms:

| | |
|---|---|
| Cash, upon execution | $ 25,000.00 |
| Cash, at settlement | 75,000.00 |
| First mortgage note receivable from Mr. Powell | 800,000.00 |
| Total | $900,000.00 |

The contract further stated:

Sellers and Purchaser acknowledge the existence of a Contract of Sale dated February 26th, 1969, between Shore Title Co., Inc., Vendor–Seller, and Shepard G. Powell or Assigns, Vendee–Purchaser, copy of which is attached hereto and made a part hereof, whereby that Vendor has contracted to sell and that Vendee has agreed to buy from that Vendor at and for the purchase price of Two Hundred Seventy Two Thousand Two Hundred Dollars ($272,200.00) * * * [the Virginia property]. As a further consideration for the making of this Contract of Sale * * * for the sale and purchase * * of * * * [the Maryland property] the said Shepard G. Powell or Assigns, for the sum of One Hundred Dollars ($100.00) in cash, in hand paid, receipt whereof is hereby acknowledged, does hereby bargain, sell, set over and transfer unto said Franklin B. Biggs all of the right, title and interest of the said Shepard G. Powell or Assigns in and to said Virginia property and said Contract of Sale relating thereto, upon condition that the said Franklin B. Biggs assumes and covenants to pay (which he hereby does) all of the obligations assumed by the said Shepard G. Powell under the aforesaid Contract of Sale between him and Shore Title Co., Inc.; and said Franklin B. Biggs hereby agrees to hold Shepard G. Powell or Assigns harmless from any liability under any and all of said obligations on said Virginia property, and the said Shepard G. Powell and said Franklin B. Biggs do hereby jointly and separately agree to execute and deliver any and all necessary papers to effect delivery of title to said Virginia property to said Franklin B. Biggs and to relieve said Shepard G. Powell from any and all obligations assumed by him thereon.

On the same date, Powell and his wife assigned their contractual right to acquire the Maryland property to Samuel Lessans and Maurice Lessans. The Lessanses, in turn, sold and assigned their rights to acquire the Maryland property to Ocean View Corporation (hereinafter referred to as "Ocean View") a Maryland corporation, for $1,300,000.00 by an agreement dated May 22, 1969. The purchase price was comprised of $150,000.00 to be paid into escrow at the

time the contract was signed, an $800,000.00 note executed by Ocean View in favor of Biggs at the time of settlement, a $250,000.00 note from Ocean View to the Lessanses, and a $100,000.00 note from Ocean View to the real estate agents at closing.

Ocean View was incorporated on May 21, 1969. At the first meeting of its board of directors, the corportation was authorized to acquire the Maryland property and, also, to quit–claim any interest it might have in the Virginia property. It is undisputed, though, that neither the Lessanses nor Ocean View had any interest whatsoever in that property.

On May 24, 1969, Shore executed a deed conveying all of its right, title and interest in the Virginia property to Biggs. Powell and his wife, the Lessanses and Ocean View all joined in executing the deed as grantors, despite their apparent lack of any cognizable interest in the property. This instrument provided that:

> [T]he said Shore Title Co., Inc., a Maryland corporation, executes this deed to the Grantee herein for the purpose of conveying the * * * Virginia property hereinafter described by good and marketable title, subject to the assumption by the Grantee herein of the obligations hereinafter referred to, and all of the other Grantors herein join in the execution of this deed for the purpose of releasing and quit–claiming any interest in and to the property described herein and for the purpose of thereby requesting Shore Title Co., Inc. to convey said property to the Grantee herein in the manner herein set out . . . .

By the same deed, Biggs agreed to assume and pay the notes in favor of the mortgagee and the owners from whom Shore had acquired the Virginia property, in the total sum of $142,544.86. On May 29, 1969, Biggs executed a deed of release in favor of Shore indicating payment in full of the $115,655.14 bond.

1. Biggs admits that, even if the transaction qualifies as a § 1031 exchange, he used an incorrect method to calculate the gain to be recognized.

2. The Tax Court opinion is reported at 69 T.C. 905 (1978).

On May 26, 1969, Biggs and his wife, Powell and his wife and the Lessanses sold the Maryland property to Ocean View. Contemporaneously, Ocean View executed a mortgage in the face amount of $800,000.00 in favor of Biggs. Also on this date, all of the contracts were closed. Ocean View received the deed to the Maryland property and Biggs accepted title to the Virginia property.

Biggs reported his gain from the sale of the Maryland property on his 1969 federal income tax return as follows: [1]

| | | |
|---|---:|---:|
| Selling price of Maryland property | $900,000.00 | 100.00% |
| Exchange-Virginia property | 298,380.75 [a] | 33.15% |
| Boot | $601,619.25 | 66.85% |
| Selling price Maryland property | $900,000.00 | |
| Basis-date of exchange | 186,312.80 | |
| Gain | $713,687.20 | |
| Not recognized-exchange (Sec. 1031 I.R.C.) 33.15% | 236,587.31 | |
| Taxable gain | $477,099.89 | 53.011% |

[a] Such figure included finders' fees and legal costs incident to the acquisition of the Virginia property.

Biggs elected to report the transaction under the installment sales provision of § 453 of the Code. The Commissioner issued a notice of deficiency based upon his determination that there was no exchange of like–kind properties within the meaning of § 1031. The Tax Court disagreed, and ruled in favor of Biggs.[2]

 Section 1031 provides, in pertinent part, that the gain realized on the exchange of like–kind property held for productive use or investment shall be recognized only to the extent that "boot" or cash is received as additional consideration.[3] The Commissioner does not deny that Biggs fully in-

3. § 1031(a):

> No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial inter-

tended to carry out an exchange that would pass muster under § 1031. It was undoubtedly for this purpose that Biggs insisted from the beginning of his negotiations with Powell that he receive property of like kind as part of the consideration for the transfer of the Maryland property. *Cf. Alderson v. C.I.R.*, 317 F.2d 790 (9th Cir. 1963). However, as this court made clear in *Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967), the mere intent to effect a § 1031 exchange is not dispositive. Indeed, the Commissioner's primary contention is that, under the authority of our holding in *Carlton*, Biggs failed to accomplish an exchange because the purchaser, Powell, never held title to the Virginia property.

The facts on which *Carlton* was decided parallel those which we now consider in several respects. Carlton, the taxpayer, wished to trade a tract of ranch land for other property of a similar character in order to obtain the tax benefits afforded by § 1031. This intent was made explicit in the negotiations and resulting option contract entered into by Carlton and General, a corporation which desired to purchase the ranch property. Carlton proceeded to locate two parcels of suitable exchange property, negotiate for the acquisition of this property, and pay a deposit on each parcel. General executed the actual agreements of sale and then assigned its contract rights to purchase the exchange property to the taxpayer. However, the crucial factor which distinguishes *Carlton* from the instant case is that General actually paid cash for the ranch property which Carlton then used two days later to purchase the exchange property. A panel of this court held that the receipt of cash transformed the intended exchange into a sale:

> [W]hile elaborate plans were laid to exchange property, the substance of the transaction was that the appellants received cash for the deed to their ranch property and not another parcel of land. The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property.

385 F.2d at 242 (footnote and citations omitted).

■ Although the payment and receipt of cash was the determinative factor, the court went on to cite additional reasons to support its holding of a sale, rather than an exchange:

> Further, General was never in a position to exchange properties with the appellants because it never acquired the legal title to either the Lyons or the Fernandez property. Indeed, General was not personally obligated on either the notes or mortgages involved in these transactions. Thus it never had any property of like kind to exchange. Finally, it cannot be said that General paid for the Lyons and Fernandez properties and merely had the properties deeded directly to the appellants. The money received from General by the appellants for the ranch property was not earmarked by General to be used in purchasing the Lyons or Fernandez properties. It was unrestricted and could be used by the appellants as they pleased.

385 F.2d at 242–243. The Commissioner maintains that this language in *Carlton* establishes as an absolute prerequisite to a § 1031 exchange that the purchaser have title to the exchange property. We do not agree with this interpretation. The *Carlton*

est, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

§ 1031(b):

If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it

were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

decision was based on the aggregate circumstances discussed therein and, as we have noted, the most significant of these was the receipt of cash by the taxpayer. In the present case, the transfer of the Maryland property and the receipt of the Virginia property occurred simultaneously, and the cash paid to Biggs at the closing constituted "boot." Also in contrast to the facts found in *Carlton*, Powell, as contract purchaser, did "assume [ ] and covenant [ ] to pay . . . promissory notes, all secured by deeds of trust on the Virginia property," plus the balance due at settlement. We cannot ignore the legal obligations and risks inherent in this contractual language, even though Powell was subject to such risks only for a short period of time. Also, the unrestricted use of funds which was a problem in *Carlton* is of no concern here because Biggs received cash only upon the closing of all transactions.

Thus, we are left with the sole consideration that Powell never acquired legal title to the Virginia property. Yet, if we were to decide, as the Commissioner urges, that this factor alone precludes a § 1031 exchange, we would contravene the earlier precedent established by this court in *W.D. Haden Co. v. C.I.R.*, 165 F.2d 588 (5th Cir. 1948). *Haden* also involved a multi–party exchange in which the purchaser, Goodwin, never held title to the exchange property. However, since Goodwin had contracted to purchase the property, the court held that the taxpayer had effected a like–kind exchange, stating that the purchaser "could bind himself to exchange property he did not own but could acquire." 165 F.2d at 590.

Our resolution of the title issue is also tangentially supported by language contained in the Ninth Circuit's recent opinion in *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979). Briefly stated, the *Starker* facts involved a transfer of the taxpayer's real property to the purchaser, Crown Zellerbach Corp., in exchange for the corporation's promise to acquire other real property in the future and convey it to the taxpayer. The government argued that this arrangement did not qualify for § 1031 treatment because the transfers were not simulta-

neous and, alternatively, the contract right received by the taxpayer was personal property and, hence, not like–kind to the real property he had conveyed. The Ninth Circuit disagreed and, in response to the latter argument, stated:

> This is true, but the short answer to this statement is that title to real property, like a contract right to purchase real property, is nothing more than a bundle of potential causes of action: for trespass, to quiet title, for interference with quiet enjoyment, and so on. The bundle of rights associated with ownership is obviously not excluded from section 1031; a contractual right to assume the rights of ownership should not, we believe, be treated as any different than the ownership rights themselves. Even if the contract right includes the possibility of the taxpayer receiving something other than ownership of like–kind property, we hold that it is still of a likekind with ownership for tax purposes when the taxpayer prefers property to cash before and throughout the executory period, and only like–kind property is ultimately received.

602 F.2d at 1355. Of course, we need not, and do not, express either acceptance or disapproval of the ultimate holding in *Starker*. However, the Ninth Circuit's discussion of the title versus right–to–purchase problem is, we believe, consistent with our own analysis.

■ We must also reject the Commissioner's assertions that the Tax Court applied the so–called "step–transaction doctrine" incorrectly, and that the transactions which occurred here were in substance a sale for cash of the Maryland property and an unrelated purchase of the Virginia property. The step–transaction doctrine was articulated in *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652 (5th Cir. 1968):

> [A]n integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer. (Citation omitted.) In *Kanawha Gas and Utilities Co. v. Commissioner*, 5 Cir. 1954, 214 F.2d 685, 691, our Court through Judge Rives said:

'In determining the incidence of taxation, we must look through form and search out the substance of a transaction .... [cases cited] This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated.'

399 F.2d at 658. The Tax Court found that the many transactions leading to the ultimate transfers of the Maryland and Virginia properties were part of a single, integrated plan, the substantive result of which was a like–kind exchange. This finding is amply supported by the evidence. Biggs insisted at all times that he receive like–kind property as part of the consideration for the transfer of the Maryland property. Powell agreed to this arrangement and assured Biggs of his cooperation. Biggs was careful not to contract for the sale of the Maryland property until Powell had obtained an interest in the Virginia land. When he and Powell did enter into an agreement of sale on February 26, 1969, the exchange was made an express condition of the contract. Biggs also avoided the step which was fatal to the taxpayer's intended exchange in *Carlton*; i. e., he did not receive any cash prior to the simultaneous closings of the properties on May 26, 1969. Under these circumstances, the Tax Court correctly determined that all transactions were interdependent and that they culminated in an exchange rather than a sale and separate purchase.

Finally, we examine the Commissioner's claim that Shore was serving as an agent for Biggs throughout the transactions, and that the accomplishment of the intended exchange was thereby precluded.[4] Admittedly, the exchange would have been meaningless if Shore, acting as Biggs' agent, acquired title to the Virginia property and then executed the deed conveying title to Biggs. For, in essence, Biggs would have merely effected an exchange with himself. *Cf. Coupe v. C.I.R.*, 52 T.C. 394 (1969). However, while the Tax Court refused to find, in contrast to its decision in *Coupe*, that Shore acted as an agent for the purchaser, Powell, it also specifically determined that Shore was not an agent of Biggs. Rather, Shore accepted title to the Virginia property, albeit at Biggs' request, merely in order to facilitate the exchange. We believe that this is an accurate characterization of Shore's role in the transactions. Consequently, we reject the Commissioner's agency notion also.

Undoubtedly, the exchange of the Maryland and Virginia properties could have been more artfully accomplished and with a greater economy of steps. However, we must conclude on the facts before us that the taxpayer ultimately achieved the intended result. Accordingly, the decision of the Tax Court is

AFFIRMED.

---

4. In advancing this argument, the Commissioner does not seem to focus on Shore's purported status as Biggs' agent, but rather on the fact that Shore was not Powell's agent for purposes of accepting title to the Virginia property. However, our disposition of the title question renders the absence of a principal–agent relationship between Powell and Shore irrelevant.