**FEDERAL NATIONAL MORTGAGE ASSOCIATION,**
Appellant/Cross–Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Appellee/Cross–Appellant.

Nos. 88–1827, 88–1853.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 5, 1990.

Decided Feb. 20, 1990.

Joseph Angland, New York City, with whom Felix B. Laughlin, David C. Garlock, and Richard F. Neel, Jr., Washington, D.C., were on the brief, for appellant in no. 88–1853 and cross-appellee in no. 88–1827.

Bruce R. Ellison, Atty., U.S. Dept. of Justice, with whom Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Richard Farber, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for appellee in no. 88–1827 and for cross-appellant in no. 88–1853. William S. Rose, Jr., Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for appellee in 88–1827 and for appellant in 88–1853.

Before MIKVA and RUTH B. GINSBURG, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Federal National Mortgage Association ("FNMA") was severely impacted by the dramatic rise in interest rates in the late 1970s. As a result, FNMA entered into two types of mortgage transactions in the early 1980s through which it sought to improve its economic standing. The Resale/Refinance program was designed to replace uneconomical low-interest mortgages in FNMA's portfolio with higher-interest mortgages. The Concurrent Mortgage Sales program ("CMS") was structured to allow FNMA to recognize losses in its mortgage portfolio caused by the rising interest rates.

The Commissioner of Internal Revenue (the "Commissioner") disallowed losses that FNMA claimed from both Resale/Refinance and CMS transactions, and FNMA challenged the Commissioner's deficiency determination of over $24 million in the United States Tax Court. *Federal Nat'l Mortgage Ass'n v. Commissioner*, 90 T.C. 405 (1988). In a decision reviewed by the full court with no separate opinions, the Tax Court upheld the Commissioner's disallowance of the losses from the Resale/Refinance program but rejected his decision with respect to the CMS transactions. The taxpayer appeals the former ruling and the Commissioner cross-appeals the latter. We affirm the Tax Court's decision.

I

FNMA was originally established as a government agency but became a privately.

owned, for-profit corporation in 1968. FNMA is subject to regulation by the Secretary of HUD. FNMA's primary function is to provide liquidity for mortgage investments, which it accomplishes mainly by purchasing mortgages from lenders with funds that FNMA generates by issuing stock and debt securities.

In the early 1980s, FNMA's portfolio consisted of many long-term, fixed-rate mortgages which had decreased substantially in value because of the enormous increase in interest rates since FNMA had purchased these mortgages. By 1981, FNMA was paying more interest on the debt it used to carry the mortgages in its portfolio than it was earning from the mortgages. In order to improve its financial standing, FNMA entered the two types of transactions at issue in this appeal.

## II

### A. The CMS Transactions

#### 1. *Background*

Because of the decrease in value of FNMA's portfolio mortgages, FNMA had a strong incentive in the early 1980s to dispose of these mortgages and recognize the tax losses it had incurred. Many financial institutions—and particularly savings and loan institutions—were similarly burdened with long-term mortgages that had been devalued by the rise in interest rates. These financial institutions desired the tax losses that would be recognized in a disposition of the below-market mortgages they were carrying but would have been at risk of closure by the Federal Home Loan Bank Board ("FHLBB") if they had to recognize these losses for reporting purposes. In order to address this situation, the FHLBB issued Memorandum R–49 ("R–49") on June 27, 1980, in which it outlined criteria for mortgage exchanges. Exchanges carried out pursuant to these criteria would enable the lenders to recognize for tax purposes the losses that they had suffered in their portfolios while freeing these lenders from the duty to report such losses for regulatory accounting purposes.

In 1980 and 1981, FNMA engaged in 71 different mortgage exchange transactions; in each, FNMA and one of 50 unrelated lenders exchanged 90–percent undivided participation interests in two groups of home mortgages. Although FNMA is not governed by the FHLBB, most of the lenders with which FNMA exchanged mortgages are subject to FHLBB regulation. Therefore, the mortgage exchanges were designed to comply with the R–49 criteria. FNMA computer-sorted the mortgages that lenders proposed to swap and FNMA's own mortgages in order to generate mortgage packages that complied with R–49 and FNMA's own exchange criteria. Additionally, FNMA programmed its computer to replace mortgages on rural property with mortgages on urban property to the extent possible. As a result of these exchanges, FNMA claimed losses of $194,573,659 in 1980 and $70,042,179 in 1981. The Commissioner disallowed the deduction of these losses.

In response to FNMA's petition, the Tax Court held that FNMA had realized recognizable losses from its CMS exchanges in 1981 and 1982. In reaching this conclusion, the Tax Court rejected the Commissioner's argument that the mortgages FNMA received in the CMS transaction did not differ materially from the mortgages that it surrendered and, therefore, FNMA did not sustain any recognizable loss. The Tax Court based its conclusion on the following significant differences in the mortgages exchanged: the mortgages FNMA received had different obligors than the mortgages it exchanged; the real properties securing the respective mortgages were different; and the geographic distribution of the real properties securing the mortgages varied. The Tax Court deemed it a confirmation of "material difference" that the mortgages had, in fact, performed differently following the exchanges.

The Tax Court also rejected the Commissioner's argument that Internal Revenue Code ("IRC") § 1091's "substantial identity" rule precludes the recognition of losses realized by FNMA, concluding that—for the reasons stated above—the mortgages exchanged were substantially different.

Finally, the Tax Court disposed of the Commissioner's contention that FNMA's deductions should be disallowed because the CMS transactions lacked economic substance and reality. The court stated that genuine losses should not be disallowed simply because the petitioner is motivated by a desire to reduce its taxes. The Tax Court then cited what it found to be legitimate business reasons apart from tax reduction that motivated FNMA to engage in the CMS transactions: (1) increasing its holdings of urban loans in compliance with HUD regulations; (2) expanding its customer base by developing relationships with savings and loan institutions; (3) increasing the number of mortgages with enforceable due-on-sale clauses; and (4) supporting the secondary mortgage market by helping struggling S & Ls.

On appeal, the Commissioner renews his argument that FNMA did not incur any recognizable losses in the CMS transactions. First, the Commissioner argues that because the mortgages exchanged were "substantially identical" under R–49, they cannot be "materially different" for tax loss recognition purposes. Second, the Commissioner contends that even if FNMA realized a loss, IRC § 165 precludes deduction of losses resulting from the CMS transactions because they lack economic substance.

### 2. *Analysis*

The Fifth Circuit and the Sixth Circuit recently reached contrary conclusions about whether parties realize—and thus may recognize—tax losses from a CMS transaction. *See San Antonio Savings Ass'n v. Commissioner*, 887 F.2d 577 (5th Cir.1989) ("*SASA*") (holding that CMS transactions may generate recognizable tax losses); *Centennial Savings Bank v. United States*, 887 F.2d 595 (5th Cir.1989) (same); *First Federal Savings & Loan Ass'n v. United States*, 887 F.2d 593 (5th Cir.1989) (same). *But see Cottage Savings Ass'n v. Commissioner*, 890 F.2d 848 (6th Cir.1989) (finding no recognizable loss because the taxpayer's "economic position" was not changed by the CMS transactions). We conclude that the Fifth Circuit's deci-

sion in *SASA* provides the correct evaluation of the tax consequences of a CMS transaction and note that although *SASA* involved a three-party transfer, its holding is equally applicable to the two-party CMS transactions in the case *sub judice*. *See Centennial*, 887 F.2d at 597.

#### a. *Material Difference*

1) *The Code and Regulations.* Treasury Regulation § 1001–1(a) provides the general rule that

[e]xcept as otherwise provided in subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained.

Both parties recognize that the swap of mortgages occurring in a CMS transaction constitutes an exchange of property. The only question remaining is whether the mortgages that FNMA received differed materially from the mortgages that it exchanged.

■ In order for a loss resulting from an exchange of property to be recognized for tax purposes it must be realized, and in order for this loss to be realized, the property exchanged must be materially different. Although § 1001–1(a) does not create the "material difference" requirement for realization, it incorporates this requirement—which finds ample support in caselaw—by reference. *See SASA*, 887 F.2d at 581–87.

■ 2) *Effect of R–49.* The Commissioner argues that the mortgages exchanged in the CMS transactions cannot have been "materially different," because the exchanges were carried out pursuant to R–49, which required the mortgages exchanged to be "substantially identical." The Commissioner contends that this court owes substantial deference to the FHLBB's determination. This assertion is flawed for the reasons noted by the Fifth Circuit in *SASA:*

The FHLBB is not in the business of interpreting the Internal Revenue Code.

So also the IRS is not supposed to interpret the Federal Home Loan Bank Act. Here the IRS is arguing that deference should be shown in a tax determination case to a ruling by an agency which is not charged with enforcing the tax code. The FHLBB held that the mortgages in R–49 exchanges are "substantially identical" for its own accounting. The IRS would have us defer to the FHLBB on the "substantial identity" but not on the "material difference" of the loans, and it would apply the "substantial identity" ruling (an accounting ruling) to the tax standard of "material difference." "[I]t has been consistently held that the accounting requirements of regulatory agencies are not controlling in the application of the revenue laws, which establish their own standards." *Bellefontaine Federal Sav. & Loan Ass'n v. Commissioner*, 33 T.C. 808, 811–812 (1960).

887 F.2d at 591; *see also Thor Power Tool v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979).

■ The Tax Court determined that the mortgages exchanged in the CMS transactions were "materially different" because the obligors were different, the property securing the loans was different, and the geographic distribution of the mortgaged property varied. Significantly, the Tax Court also found that the exchanged properties performed differently following the CMS transactions at issue. This confirmed the court's conclusion that the mortgages that FNMA received in the transactions were " 'really different from what he theretofore had.' " 90 T.C. at 423 (quoting *Weiss v. Stearn*, 265 U.S. 242, 254, 44 S.Ct. 490, 492, 68 L.Ed. 1001 (1924)). The Commissioner does not dispute the trial court's factual findings.

We are persuaded that the differences in the mortgages exchanged are sufficient to support the Tax Court's holding that they were materially different. The differences in the underlying properties and obligors foreclose any argument that the exchanged mortgages were identical.

### b. *Section 165*

IRC § 165(a) provides that a taxpayer is allowed to deduct any losses that it sustained during the taxable year for which the taxpayer did not receive offsetting compensation from insurance or some other source. Treasury Regulation § 1.165–1(b) states that a loss is not deductible if it derives from a transaction that lacks economic substance.

The Commissioner contends that the CMS transactions lacked economic substance because the mortgages exchanged were not materially different and the alternative business purposes for the exchanges found by the Tax Court are trivial or illusory. Because we conclude that the mortgages exchanged were substantially different, we necessarily reject the Commissioner's first line of reasoning. Likewise, the Commissioner has failed to demonstrate that the Tax Court's factual findings regarding the alternative business purposes motivating FNMA to engage in the CMS transactions were clearly erroneous.

■ In any case, we agree with the *SASA* court's conclusion that the CMS transactions did not lack economic substance even if the sole motive for entering these transactions was to obtain beneficial tax treatment of its losses. The Code and Regulation sections cited by the Commissioner are aimed at transactions that taxpayers enter to *generate* losses that would otherwise not exist. By contrast, it is indisputable that FNMA and the lenders with which it exchanged mortgages had suffered genuine losses in their respective mortgage portfolios because of escalating interest rates. The CMS transactions did not *produce* the losses in question; these exchanges merely provided a means to recognize the losses without simultaneously threatening the existence of the FHLBB-regulated lenders. Thus, IRC § 165 and Regulation § 1.165–1(b) do not apply in this context. *See SASA*, 887 F.2d at 592–93.

As noted, the decision of the Sixth Circuit in *Cottage Savings* is in direct conflict with those of the Fifth Circuit on this issue. We reject the Sixth Circuit's reasoning and result in favor of the more persuasive

analysis of the Fifth Circuit and the Tax Court of the tax consequences attending CMS transactions.

## B. Resale/Refinance Program

### 1. *Background*

The Tax Court described the economic circumstances confronting FNMA when it initiated the Resale/Refinance program:

> From 1980 through 1982, petitioner's assets consisted largely of long-term, fixed-rate mortgage loans. Interest rates had increased since the mortgage loans were issued and the value of the mortgages had therefore declined significantly. Petitioner's debt during those years was relatively short-term compared to its assets. As interest rates rose, the interest petitioner paid on its debt increased more rapidly than the interest it received on its assets. By 1979, petitioner was paying a higher interest rate on its new borrowings than the average rate it received from its mortgages. By 1981, petitioner was paying more interest on the debt it used to carry its mortgages than it was earning from the mortgages and was losing money. The situation threatened petitioner's economic viability.

*Federal Nat'l Mortgage Ass'n*, 90 T.C. at 407 (footnotes omitted). The Tax Court noted, and the Commissioner does not dispute, that FNMA engaged in the Resale/Refinance program to reduce its losses and accomplish other business objectives. *Id.* at 417.

 The Resale/Refinance program was accomplished by a series of agreements between three parties—FNMA, borrowers on mortgages held in FNMA's portfolio, and lenders who serviced those mortgages. Through the Resale/Refinance program, FNMA replaced old below market-rate mortgages in its portfolio with new mortgages secured by the same property. The new mortgages were greater in principal amount and carried a higher, but still below-market interest rate.

FNMA did not originate the new mortgages that it obtained under the Resale/Refinance program. Instead, the lender contacted a borrower on an FNMA-held loan who wanted to obtain more credit at a below-market rate. The lender then obtained a 90–day commitment from FNMA to buy the new mortgage from the lender at its face amount. FNMA's "obligation to purchase the new mortgage was contingent on the borrower's payment in full of the remaining principal amount of the original mortgage." *Id.* at 419. The mechanics of a Refinance transaction entailed: (1) the borrower's receipt of additional funds in return for the execution of the new mortgage, (2) retirement of the original loan, and (3) FNMA's purchase of the new loan at face amount from the lender. As described by the Tax Court:

> At the settlement of a new mortgage, the borrower would execute the new mortgage, and the lender originating the new mortgage would transfer cash equal to the full principal amount of the new mortgage as follows: Cash equal to the unpaid principal balance of the original mortgage was paid by the lender to [FNMA], and the remainder of the cash was paid to the borrower.

> After each settlement, the lender obtained the original mortgage note from [FNMA] and recorded the release of that lien with the local recorder of deeds. The lender then submitted the new mortgage to [FNMA]. After [FNMA] confirmed that the original mortgage had been paid in full and that the terms of settlement were consistent with its commitment, it issued a check to the lender in the face amount of the new loan.

*Id.* at 419. A Resale transaction operated similarly to a Refinance transaction, except that in a Resale transaction, the borrower on each new mortgage was different than the obligor on the old mortgage.

FNMA reported neither gain nor loss from the Resale/Refinance transactions on its 1981 and 1982 federal income tax returns. Nor did FNMA report any gain or loss for financial accounting purposes. On its amended 1981 and 1982 returns, however, FNMA reported net losses of slightly over $335 million from the Resale/Refinance program by treating the transactions as taxable exchanges of the old mortgages

plus cash for the new mortgages. It measured the loss with respect to each new mortgage as the difference between the fair market value of the new loan and the sum of FNMA's basis in the original mortgage secured by the same property plus the cash payment made by FNMA to the lender.

The Commissioner disallowed the loss deduction in full. He treated each Resale/Refinance transaction as a payoff of an old loan by the borrower followed by FNMA's purchase of a new loan from the lender. Accordingly, the Commissioner determined that FNMA had realized gain of over $28 million, the amount by which the unpaid balance of the old loans exceeded FNMA's bases in those loans.

The Tax Court upheld the Commissioner's determination. Although the Tax Court acknowledged that the Resale/Refinance transactions were interrelated, it reasoned that once the old mortgage had been paid off, the old note marked paid, and the lien securing it released, no property remained for FNMA to exchange for the new mortgage.

FNMA, invoking the "step-transaction" doctrine, asks this court to skip over the interim step of the old loan payoffs and to focus solely on the starting and terminal points of the Resale/Refinance program for FNMA. At the outset, FNMA held an old below-market rate mortgage; after a Resale/Refinance transaction, FNMA held a new, still below-market rate mortgage in its stead. Under the step-transaction doctrine, one of the applications or manifestations of the substance-over-form doctrine, "a series of transactions designed and executed as parts of a unitary plan to achieve an intended result.... will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation." *Kanawha Gas & Utilities Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir.1954).

### 2. Analysis

The Tax Court provided two bases for disposing of FNMA's argument that each Resale/Refinance transaction must be viewed as a taxable exchange of the existing mortgage plus cash for the new higher-rate mortgage. First, the court found that FNMA had not shown an honest and consistent respect for what it claimed to be the substance of the Resale/Refinance transactions. The Tax Court seemed concerned that FNMA had engaged in procedural sleight of hand by recharacterizing these transactions *post hoc* in order to maximize its tax position. Second, the Tax Court determined that there had been no genuine "exchange" in each Resale/Refinance transaction, as the original mortgage was paid off before FNMA purchased the new mortgage from the lender.

We agree with the second reason for the Tax Court's holding on this issue. In order for FNMA to succeed in proving a recognizable loss, it must be able to show a genuine exchange; FNMA has failed to do so. We need not resolve the ephemeral question of "form versus substance" implicit in the Tax Court's determination that FNMA did not show an "honest and consistent respect" for what it claims to be the "substance" of the Resale/Refinance transactions.

FNMA's undisputed goal in engaging in Resale/Refinance transactions was to improve its economic standing by eliminating mortgages in its portfolio that had become uneconomical to maintain. FNMA did replace these mortgages with new, higher-rate mortgages. The difficulty with FNMA's tax argument is that an "exchange" for tax purposes is a term of art with specific legal requirements and consequences. FNMA's attempt to broaden the definition of "taxable exchange" to include the sort of replacement that occurred in this case is unavailing.

The Commissioner correctly notes that Treasury Regulation § 1.1002–1(d) defines an exchange as "a reciprocal transfer of property." Tax cases describing exchanges echo this notion of reciprocity in the transfer of property rights, and support applying some version of the substance-over-form doctrine to characterize *reciprocal* purchases and sales as exchanges for tax purposes. *See Biggs v.*

*Commissioner*, 632 F.2d 1171 (5th Cir. 1980); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652 (5th Cir.1968); *Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967); *Allegheny County Auto Mart, Inc. v. Commissioner*, 12 T.C.M. (CCH) 427, *aff'd per curiam*, 208 F.2d 693 (3d Cir. 1953); Rev.Rul. 77–297, 1977–2 C.B. 304.

In *Carlton*, the Fifth Circuit recognized that a court must look beyond the form of a transaction "to determine its reality and substance, for it is the substance of the transaction which decides the incidents of taxation." 385 F.2d at 242. Even applying this holistic approach to evaluating a transaction, however, the court made clear that it could not find an "exchange" in substance absent a genuine "transfer of property *between* owners." *Id.* (emphasis supplied).

Revisiting the "exchange" issue in *Biggs*, the Fifth Circuit disavowed the argument that *Carlton* "establishes as an absolute prerequisite to a § 1031 exchange that the purchaser have title to the exchange property." *Biggs*, 632 F.2d at 1176. The court recognized that such a holding would conflict with the circuit's decision in *W.D. Haden Co. v. Commissioner*, 165 F.2d 588 (5th Cir.1948), in which the court held that it was possible to effect an "exchange" for tax purposes where one party had bound " 'himself to exchange property he did not own but could acquire.' " *Biggs*, 632 F.2d at 1177 (quoting *Haden*, 165 F.2d at 590). Thus, even in *Haden*, the case bearing the greatest factual similarity to the case *sub judice*, the court finding an "exchange" required that the parties to the transaction have at least a contractual interest in the property transferred.

FNMA asserts that in each Resale/Refinancing transaction it "exchanged" an old FNMA-owned mortgage (plus "boot") for a new lender-owned mortgage. Yet, FNMA fails to demonstrate where a reciprocal transfer with the lender occurred. The lender never acquired ownership of the old mortgage; FNMA remained as the mortgagee until the old mortgage was discharged. Neither did the lender—under a *Haden*-type approach—acquire a contractual right to purchase the old mortgage before its discharge. At the time that FNMA purchased the new mortgage from the lender, there was nothing left to exchange. One might hypothesize various ways that FNMA *could* have effected a genuine "exchange" of mortgages, but, given the way FNMA structured these transactions, there was no "exchange" in form or substance.

FNMA essentially urges this court to find that FNMA is entitled to the loss it claims because it *could* have structured the Resale/Refinance transactions as exchanges. Allowing FNMA to recast the form of the transaction that it actually undertook in order to achieve some more favorable tax consequence, however, would contravene the Supreme Court's teaching on this issue:

This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, *Higgins v. Smith*, 308 U.S. 473, 477 [60 S.Ct. 355, 357, 84 L.Ed. 406] (1940); *Old Mission Portland Cement Co. v. Helvering*, 293 U.S. 289, 293 [55 S.Ct. 158, 160, 79 L.Ed. 367] (1934); *Gregory v. Helvering*, 293 U.S. 465, 469 [55 S.Ct. 266, 267, 79 L.Ed. 596] (1935), and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." *Founders General Corp. v. Hoey*, 300 U.S. 268, 275 [57 S.Ct. 457, 460, 81 L.Ed. 639] (1937); *Television Industries, Inc. v. Commissioner*, 284 F.2d 322, 325 (2d Cir.1960); *Interlochen Co. v. Commissioner*, 232 F.2d 873, 877 (4th Cir.1956). *See Gray v. Powell*, 314 U.S. 402, 414 [62 S.Ct. 326, 333, 86 L.Ed. 301] (1941).

*Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). Cases adopting this approach emphasize the need for certainty and convenient administration in the tax system:

It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax law shall be that resulting from the form of the transaction taxpayers have chosen or from any other form they might have chosen, whichever is less.

*Television Industries*, 284 F.2d at 325.

We are unwilling to depart from this prudent course. FNMA failed to structure its deal to effect a genuine exchange of mortgages; it must live with the tax consequences of the transaction it freely chose to undertake.

### 3. *Calculation of Liability*

■ FNMA urges that, even if the Resale/Refinance transactions were not taxable exchanges, the Commissioner erred in computing FNMA's tax liability. The Commissioner calculated FNMA's liability by subtracting FNMA's basis in each mortgage from the amount FNMA received to discharge that mortgage (in each case, the unpaid principal balance of the mortgage). FNMA contends that the amount it received to pay off each mortgage must be allocated between two assets: (1) the original mortgage, and (2) FNMA's contractual commitment to purchase the new mortgage. FNMA reaches this result because it asserts that upon receipt of the cash payment, FNMA gave up more than the old mortgage: it also gave the lender the contractual right to sell a specified new mortgage to FNMA at face value, i.e., for an amount in excess of its fair market value. Under this approach, FNMA concludes that the amount it received to discharge the mortgage must be allocated in proportion to the fair market value of the old and new mortgages.

We reject this approach. This argument erroneously assumes that the *lender's* funds were used to discharge the original mortgage and to secure FNMA's contractual obligation to purchase the new loan. As noted, however, the funds that the lender transferred to FNMA to discharge the original mortgage belonged to the *borrower*. It is implausible, therefore, that some of these funds were used to secure a contrac-

tual right for the lender's benefit. This seems especially true because, under this approach, the borrower would realize discharge-of-indebtedness income to the extent that the original mortgage was discharged for less than its face value. Even apart from these inconsistencies, all of the documents surrounding the Resale/Refinance transactions show that the original mortgages were paid in full, rendering FNMA's tortured construction even less credible.

### 4. *Amendment of Commissioner's Answer*

■ FNMA argues that the Commissioner admitted in his Answer that the Resale/Refinance transactions were exchanges, and that the Tax Court erred in allowing the Commissioner to amend his Answer to strike this admission. The decision whether to grant or deny leave to amend is within the sound discretion of the trial court and may be reversed only if it is a clear abuse of discretion. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 247 (D.C.Cir.1987). Because of the deference that we must accord a trial judge's decision whether to allow amendments of the pleadings, we do not disturb the Tax Court's determination.

First, FNMA did not raise the issue of the Commissioner's admission until it filed its post-trial brief. The trial was conducted under the assumption that the Commissioner contested FNMA's claim that the Resale/Refinance transactions constituted taxable exchanges. Therefore, FNMA cannot reasonably claim that it was somehow unaware of the Commissioner's position and was deprived of an opportunity to rebut adequately the Commissioner's arguments. Because this is the underlying purpose of the pleading requirements, we do not see how FNMA was legitimately prejudiced by the Tax Court's decision to allow the Commissioner to amend. FNMA's delay until after the trial to raise the "admission" issue also deflates FNMA's conten-

 

tion that the Commissioner waited too long to request leave to amend.

Significantly, FNMA has not argued that it has any additional evidence by which it would amplify or clarify the trial record in light of the withdrawal of the Commissioner's admission. Given the obvious positions of the parties in the Tax Court proceeding, it would be disingenuous for FNMA now to claim that it relied to its detriment on the Commissioner's admission in preparing and arguing its case at trial.

Second, we reject FNMA's argument that the Commissioner's admission was clearly consistent with the position the Commissioner had taken during the administrative proceedings in this case. Language in the report generated by the IRS appeals officer assigned to this case indicates that this officer viewed "the payoff of the old mortgage and purchase of the new mortgage [as] a single, unified transaction." This does not indicate, however, that this officer viewed the transaction as an exchange for tax purposes. FNMA's assertion that this language "squarely rebut[s]" the Commissioner's assertion that the "admission" was an oversight is at least hyperbolic.

The Tax Court's decision to allow the Commissioner to amend his Answer is far from the kind of clear abuse of discretion that would warrant reversal.

### III

The economic turmoil confronting FNMA at the time it engaged in these disputed transactions was great. The urgency of the problems apparently precluded a thorough consideration of the tax consequences of the remedial actions FNMA undertook. FNMA, as a result, joins a long list of taxpayers who did their tax planning too late to obtain the benefits that such planning might otherwise have provided. A decent regard for the Commissioner's difficulties in administering a complex tax code precludes us from "rearranging" the transactions in order to downsize FNMA's taxes on the Resale/Refinance transactions.

We affirm the Tax Court's resolution of both issues raised on appeal. Because the

mortgages swapped in the CMS transactions were "materially different," FNMA is entitled to recognize the losses it incurred. In order to recognize losses in the Resale/Refinance transactions, however, FNMA had to demonstrate a genuine exchange of mortgages. Because FNMA has not shown such an exchange, it cannot recognize the losses it claims from these transactions.