T.C. Memo. 1999-346

UNITED STATES TAX COURT

FLORIDA INDUSTRIES INVESTMENT CORPORATION
AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18310-96.          Filed October 19, 1999.

<u>Kenton V. Sands</u>, for petitioners.

<u>Charles Baer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in,
additions under section 6651(a)(1)[1] to, and accuracy-related

---

[1]All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

penalties under section 6662(a) on petitioners' Federal income tax (tax), as follows:

| Taxable Year Ended | Deficiency | Addition to Tax | Accuracy-Related Penalty |
|---|---|---|---|
| February 28, 1991 | $133,316 | $50,286 | $40,228 |
| February 29, 1992 | 59,808 | 5,981 | 11,962 |
| February 28, 1994 | 158,230 | 39,558 | 31,646 |

The issues remaining for decision are:

(1) Are petitioners entitled to nonrecognition treatment under section 1031 with respect to certain gains realized by petitioner Orlando Industrial Properties, Inc. (OIP) during the taxable year ended February 28, 1991, as a result of the disposition of certain real estate interests? We hold that they are not.

(2) Are petitioners entitled to nonrecognition treatment under section 1033 with respect to certain gain realized by OIP during the taxable year ended February 28, 1991, as a result of the condemnation of certain real property? We hold that they are not.

(3) Are petitioners liable for the addition to tax under section 6651(a)(1) for each of the taxable years at issue except

the taxable year ended February 28, 1993?[2]  We hold that they are.

(4)  Are petitioners liable for the accuracy-related penalty under section 6662(a) for each of the taxable years at issue except the taxable year ended February 28, 1993?  We hold that they are.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Florida Industries Investment Corporation (FIIC) had its principal place of business in Orlando, Florida, at the time the petition was filed.

At all relevant times, FIIC was the common parent of an affiliated group within the meaning of section 1504(a).  That group included, inter alia, OIP, Indian River Farms, Inc. (IRF), and Canti Carriage Company (CCC).  Throughout the taxable years at issue, William Canty (Mr. Canty) was the sole stockholder of FIIC, which owned 100 percent of the outstanding stock of OIP, IRF, and CCC, and he also was the president of, inter alia, FIIC and each of those subsidiaries of FIIC.  At all relevant times, the principal business activity of both OIP and IRF was real estate investment and development, and the principal business activity of CCC was auto sales.

---

[2]Although respondent made determinations with respect to petitioners' taxable year ended Feb. 28, 1993, those determinations did not result in a deficiency, and respondent made no determinations under secs. 6651(a)(1) and 6662(a), for that year.

Mr. Canty negotiated all real estate transactions on behalf of FIIC, OIP, and other petitioners involved in real estate investment. As far as Mr. Canty was concerned, such negotiations were not final until a real estate deal was actually closed. When one of the petitioners was interested in buying certain real property, as a negotiating tactic Mr. Canty sometimes intentionally stalled the closing even after a real estate contract had been signed. That was because Mr. Canty believed that such a stalling tactic tended to lower the purchase price.

Petitioners filed consolidated U.S. Corporation income tax returns (consolidated returns) for the taxable years ended February 28, 1991, February 29, 1992, February 28, 1993, and February 28, 1994, on August 24, 1992, December 28, 1992, November 29, 1994, and April 27, 1995, respectively. Each of those consolidated returns was signed by C. Riggs (Mr. Riggs) as return preparer.

Claimed Section 1031 Real Estate Transactions

On September 28, 1982, pursuant to a joint venture agreement, OIP, Xway, Inc. (Xway), a Florida corporation, and Alpha Trust (Alpha), a Florida trust, formed a joint venture under the name Interstate Park (Interstate). The joint venturers formed Interstate in order to, inter alia, acquire and develop certain commercial real property located in Orlando, Florida (commercial real property), that OIP was in the process of purchasing from the School Board of Orange County, Florida (School Board). In

connection with that purchase, OIP was required to give the School Board a purchase money mortgage in the amount of $588,300 (OIP's purchase money mortgage).

OIP and Alpha each acquired a 25-percent interest in Interstate, and Xway acquired the remaining 50-percent interest in that joint venture. OIP acquired its 25-percent interest in Interstate by contributing to it the commercial real property. In return, Interstate agreed to assume and pay OIP's purchase money mortgage. Alpha and Xway acquired their respective 25-percent and 50-percent interests in Interstate by agreeing to guarantee the indebtedness assumed by Interstate.

Interstate undertook to develop and improve the commercial real property. It subdivided that property into several commercial lots (commercial lots) and installed streets and utilities on those lots. Thereafter, on June 25, 1990, OIP and Alpha agreed to redeem and surrender their respective interests in Interstate. In order to effect those agreements, (1) Interstate deeded to OIP commercial lots 11 and 12 (lots 11 and 12), and OIP assumed its share of Interstate's liabilities by executing a note in the amount of $146,374 (OIP's $146,374 note); and (2) Interstate deeded to Alpha certain other commercial lots, and Alpha agreed to assume its share of Interstate's liabilities.

At the time of the redemptions of the respective interests of OIP and Alpha in Interstate and the dissolution of Interstate as a joint venture, a contract of sale between Interstate and

Orange County Mental Health Services (Health Services) was in effect, under which Interstate agreed to sell commercial lots 14 and 15 (lots 14 and 15) to Health Services. In order to preserve the rights of Interstate's joint venturers in that pending sale, on June 25, 1990, those joint venturers established a trust (Interstate trust) to which Interstate quitclaimed lots 14 and 15 and in which OIP and Alpha each held a 25-percent, and Xway held a 50-percent, beneficial interest. On the same date, OIP, Alpha, and Xway entered into an addendum to the trust agreement which created the Interstate trust. That addendum provided that if the sale of lots 14 and 15 to Health Services were not completed by September 10, 1990, the contract of sale between Interstate and Health Services with respect to those lots would be terminated, the Interstate trust would be dissolved, and specified portions of lots 14 and 15 would be deeded to OIP, Alpha, and Xway as beneficiaries of that trust.

On July 26, 1990, (1) Interstate[3] purchased from OIP lots 11 and 12 for $470,000 ($470,000 purchase price) and (2) Xway purchased from OIP OIP's 25-percent interests in lots 14 and 15 for $700,000 ($700,000 purchase price). Mr. Canty and OIP wanted to structure the foregoing sales so as to qualify under section

---

[3]Although Interstate, the joint venture, was dissolved after two of the three joint venturers redeemed their interests therein on June 25, 1990, Xway, the remaining joint venturer and sole owner of Interstate after those redemptions, decided to use the name Interstate when it purchased lots 11 and 12 from OIP.

1031, but they did not so advise Mr. Riggs, petitioners' return preparer, until he was asked to prepare petitioners' consolidated return for the taxable year ended February 28, 1991.

Interstate paid the $470,000 purchase price for OIP's lots 11 and 12 by accepting OIP's assignment to it of OIP's $146,374 note and delivering funds equal to the balance of the $470,000 purchase price, i.e., $323,626, to The Bank of Winter Park (Bank) in its capacity as the escrow agent under an agreement entitled "EXCHANGE ESCROW SECURITY AGREEMENT" (escrow agreement). Xway paid the $700,000 purchase price for OIP's 25-percent interests in lots 14 and 15 by delivering funds in that amount to the Bank in its capacity as the escrow agent under the escrow agreement.

The escrow agreement was entered into on July 26, 1990, among Interstate as the buyer of OIP's lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15,[4] OIP as the seller there-of, and the Bank as the escrow agent. The escrow agreement provided in pertinent part:

> WHEREAS, pursuant to that certain Contract for Sale and Purchase by and between Exchangor [OIP], as Seller, and Buyer [Interstate], dated the 26 day of July, 1990 (the "Contract"), Exchangor agreed to ex-change or sell certain real property [OIP's lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15] * * * (hereinafter referred to as the "Property"); and

> WHEREAS, pursuant to the terms of the Contract, Buyer has agreed to cooperate with Exchangor in effect-ing a "like kind exchange" pursuant to the provisions

---

[4]Xway decided to use the name Interstate when it entered into the escrow agreement. See _supra_ note 2.

of Section 1031 of the Internal Revenue Code of 1986 with respect to the Property; and

WHEREAS, Exchangor is in the process of identifying a parcel or parcels of real property to be acquired by Buyer (hereinafter referred to as the "Like Kind Property"), which Like Kind Property, if acquired, will be exchanged by Buyer with Exchangor for the Property; and

WHEREAS, pursuant to the Contract, Buyer has, of even date herewith, acquired the Property from Exchangor; and

WHEREAS, pursuant to the Contract the total purchase price for the Property, after non cash adjustments, prorations and allocation of expenses (but without regard to Buyer's costs and expenses), would be $1,023,626.00 [consisting of $323,626 due from Interstate with respect to its purchase of OIP's lots 11 and 12 and $700,000 due from Interstate with respect to its purchase of OIP's 25-percent interests in lots 14 and 15] which sum shall hereinafter be referred to as the "Escrow Deposit"; and

WHEREAS, Buyer, Exchangor and Escrow Agent have agreed that Buyer shall deliver, or cause to be delivered, the Escrow Fund to Escrow Agent and Escrow Agent shall hold and disburse the Escrow Fund, as agent for Buyer, pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, * * * the parties hereto agree as follows:

1. <u>Recitals.</u> The recitations of fact and all other matters set forth in the "Whereas clauses" above are true and correct and are incorporated herein.

2. <u>Escrow Deposit.</u> Simultaneously with the execution of this Agreement, as security for Buyer's obligations under this Escrow Agreement and under the Contract regarding cooperating in effecting like kind exchanges by executing assignable contracts for acquiring exchange property or properties from the owner(s) thereof (hereinafter referred to as the "Owner"), Buyer has delivered or caused to be delivered the Escrow Deposit to Escrow Agent, * * * which Escrow Deposit shall be deposited by Escrow Agent, within two

(2) business days from the date of this Agreement, in an interest bearing account at * * * The Bank of Winter Park. * * * all interest or other returns earned there-on shall belong to Buyer and shall be held in such account by the Escrow Agent as further security for Buyer's obligations under this Escrow Agreement and under the Contract regarding cooperating and effecting like kind exchanges.  The Escrow Deposit together with any additional amounts hereafter contributed by Buyer to the Escrow Agent hereunder and all interest or other return earned thereon are hereinafter collectively referred to as the "Escrow Fund."  The Escrow Fund shall be paid and disbursed in accordance with the provisions of paragraph 5 below; provided, however, the Escrow Agent shall have no duty to investigate or otherwise determine whether any of the provisions, stipulations or conditions contained in said paragraph 5 have been met or complied with, and the only duties of the Escrow Agent with respect to disbursement of the Escrow Fund shall be to disburse the same upon three (3) days prior written notice from Buyer and Exchangor to the Escrow Agent, which disbursement by the Escrow Agent shall be in accordance with such written notice * * *.

3.  <u>Authenticity of Notice.</u>  For all purposes of this Agreement, John Hefferan is hereby authorized to act as agent for Buyer and W.A. Canty is hereby autho-rized to act as agent for Exchangor.  Any notice given to or made by said persons shall be deemed given to or made by the respective parties.  Escrow Agent shall have no duty of independent investigation or duty to verify the authority of either John Hefferan or W.A. Canty to provide such written notice as aforesaid * * *.

    *       *       *       *       *       *       *

5.  <u>Like Kind Exchange.</u>  Buyer and Exchangor agree to the following provisions and further agree that the Escrow Fund shall be disbursed to meet Buyer's obliga-tions to Exchangor in accordance with the following provisions of this paragraph 5.

(a)  <u>Identification of Like Kind Property By Exchangor.</u>  Exchangor may, at any time within forty-five (45) days after the date hereof (hereinafter referred to as the "Closing Date"), identify (as con-templated by Section 1031(a)(3) of the Code and the

Treasury Regulations promulgated thereunder) the Like Kind Property by notifying Buyer in writing of the identity of the Like Kind Property.

(b) <u>Buyer to Enter into Assignable Contract to Acquire Identified Like Kind Property.</u>  Upon identification of such Like Kind Property as provided in (a) above, Buyer agrees to execute a Contract with the Owner thereof providing for the acquisition by Buyer or his assigns of the Like Kind Property upon terms and conditions acceptable to, and approved in writing by Exchangor, which contract shall be executed by Buyer within three (3) days following the receipt by Buyer of written direction from Exchangor to execute said Contract.  It is agreed that Buyer shall not be required to execute a contract for the acquisition of the Like Kind Property unless Buyer's total potential liability upon default under said contract does not exceed an amount equal to the "Agreed Amount" (as hereinafter defined) payable with respect to such Like Kind Property.  Buyer will simultaneously assign any such contract to Exchangor which will close in its own name. Buyer will expend the escrow funds to complete the purchase of the exchange properties in Exchangor's name.

(d) <u>Disposition of Funds If Some or All Like Kind Properties Are Not Acquired.</u>  In the event that the non simultaneous like kind exchange of the Exchange Property contemplated hereunder is not consummated in whole or in part in accordance with the provisions of this paragraph 5, Buyer and Exchangor agree that the Escrow Agent shall distribute the Escrow Fund as follows:

(1)  In the event Exchangor does not identify all or any of the Like Kind Property within the forty-five (45) day period referred to in (a) above, then Exchangor shall notify Buyer in writing at any time after the expiration of such forty-five (45) day period and Buyer, within three (3) business days of receipt of said written notice, shall cause Escrow Agent to pay to Exchangor an amount equal to the Agreed Amount.

(2)  If any portion of the Agreed Amount has not been expended by Buyer at the expiration of the one hundred eighty (180) day period [after July 26, 1990] * * * and has not previously been paid by Escrow Agent or Buyer to Exchangor under (1) above, such unpaid portion shall be paid by Escrow Agent to Exchangor no

later than five (5) business days after the expiration of such period.

(3)  Any funds held by the Escrow Agent hereunder after making the distributions provided for in subparagraphs 5(d)(1) and (2) above shall be paid to Buyer within five (5) days after expiration of the one hundred eighty (180) day period referred to above.

(e)  <u>Defined Terms.</u>  For purposes of this paragraph 5:

(1)  As used in subparagraphs 5(b) * * * and (d)(1), the term "Agreed Amount" shall mean an amount equal to the sum of the Net Cash, decreased by any portion thereof previously expended, or required under this paragraph 5 to be expended, by the Buyer for other Like Kind Property (together with the "growth factor" attributable thereto), or otherwise paid from the Escrow Fund at the direction of Buyer to Exchangor (together with the "growth factor" attributable thereto), pursuant to this Paragraph 5 (the "Modified Net Cash"), plus a "growth factor" equal to an amount determined by multiplying the Modified Net Cash by the product which results from multiplying *% by the actual number of days from the date of the closing provided for in Paragraph 5 hereof to the date of the acquisition by Buyer of the Like Kind Property from the Owner as contemplated hereunder.

* to be determined

(2)  As used in subparagraph 5(d)(2), the term "Agreed Amount" shall mean an amount equal to the sum of the Net Cash decreased by any portion thereof previously expended from the Escrow Fund at the direction of Buyer for other Like Kind Property (together with the "growth factor" attributable thereto), or otherwise paid from the Escrow Fund to Exchangor pursuant to this Paragraph 5 (the "Modified Net Cash"), plus a "growth factor" equal to an amount determined by multiplying the Modified Net Cash by the product which results from multiplying *% by the actual number of days from the Closing Date to the date the amounts due Exchangor as provided for in subparagraph 5(d)(2) are paid to Exchangor.

* to be determined

(3) "Net Cash" shall mean the portion of the total purchase price that would have been payable under the Contract by Buyer to Seller for the Exchange Property (if Buyer had acquired such Exchange Property for cash rather than pursuant to a nonsimultaneous exchange) adjusted for all applicable credits, adjustments and prorations but excluding Buyer's closing costs and expenses.

\*       \*       \*       \*       \*       \*       \*

7. <u>Miscellaneous Provisions.</u>  The following miscellaneous provisions all apply to this Agreement:

\*       \*       \*       \*       \*       \*       \*

(e) <u>Amendment and Modification.</u>  The parties may amend, modify or supplement this Agreement only in the form of a written agreement signed by all the parties.

After the escrow agreement was entered into on July 26, 1990, the parties to that agreement never amended, modified, or supplemented it by signing a written agreement to that effect, as required by paragraph 7(e) of the escrow agreement.

The escrow agreement was signed on behalf of OIP by Mr. Canty as its president, on behalf of Interstate by the secretary and treasurer of Xway which was the sole owner of Interstate, and on behalf of the Bank by the Bank's president.  John Hefferan (Mr. Hefferan) also signed the escrow agreement as "TRUSTEE FOR INTERSTATE PARK JOINT VENTURE" (Interstate's trustee).  It was Mr. Canty who asked Mr. Hefferan to sign the escrow agreement as Interstate's trustee, and Mr. Hefferan agreed to do so, even though Mr. Hefferan was not familiar with either Interstate or Xway and did not know Bernard Kaplan (Mr. Kaplan), the president of Xway who controlled Interstate after OIP and Alpha redeemed

their respective interests in that joint venture and who was the person with whom Mr. Canty, acting on behalf of OIP, dealt.

Mr. Hefferan, who is an attorney, has known Mr. Canty for approximately 40 years and has had numerous contacts with him during that time, including doing legal work for various companies or partnerships in which Mr. Canty had some direct or indirect interests and, to a lesser extent, for Mr. Canty personally. Since 1982, Mr. Hefferan has represented Mr. Canty and certain entities in which he had interests, including certain of the petitioners herein, with respect to at least 19 separate matters. On August 23, 1990, while the escrow agreement was in effect, OIP made a contribution to Mr. Hefferan's election campaign account.

In signing the escrow agreement as Interstate's trustee, Mr. Hefferan understood that he was acting as the trustee for Interstate of funds that it was depositing into the Bank under the escrow agreement and that were to be used to pay for the purchase of property designated by OIP. Mr. Hefferan further understood that his primary duty to Interstate under the escrow agreement was to sign contracts to buy property which were brought to him by either Interstate or OIP, but which in fact were usually presented to him by Mr. Canty as OIP's agent. The escrow agreement was silent as to the standard to be used by Mr. Hefferan in approving contracts to buy property that were presented to him. However, Mr. Hefferan understood from reading that agreement that

Mr. Kaplan who was acting on behalf of Interstate acquired certain properties from Mr. Canty acting on behalf of OIP, that Mr. Kaplan acting on behalf of Interstate agreed to place the cash to fund those purchases in escrow, and that any reasonable request by Mr. Canty on behalf of OIP to buy property with that escrowed cash would be granted, but only up to the amount of such cash.

Pursuant to the escrow agreement, Interstate deposited into a money market trust account at the Bank (escrow account) the aggregate amount (i.e., $1,023,626) owed OIP with respect to the purchases from OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15 (escrowed sales proceeds). (We shall refer to the escrowed sales proceeds and any interest earned thereon and belonging to Interstate pursuant to paragraph 2 of the escrow agreement as the escrow fund.)

On July 27, 1990, OIP purchased for $750,000 an apartment complex (Brentwood property) in Irving, Texas. Of the total purchase price that OIP paid for the Brentwood property, $637,500 was financed through a loan from the Resolution Trust Corporation. After debits and credits reflected in the closing statement, the balance due with respect to the purchase of that property was $170,688.17. That balance was paid by a wire transfer on July 27, 1990, in the amount of $200,000 that Mr. Hefferan authorized be made with a portion of the escrow fund. The portion of that $200,000 wire transfer which was not used to

pay the balance due on the purchase of the Brentwood property, i.e., $29,311.83, was not redeposited into the escrow account.

On November 20, 1990, OIP purchased from Mr. Canty his residence in Orlando, Florida. Thereafter, Mr. Canty continued to live rent free in that residence. Of the total purchase price that OIP paid Mr. Canty for his residence, $125,000 was paid with a portion of the escrow fund. OIP acquired no other residential properties during the early 1990's.

On December 11, 1990, OIP purchased for $490,000 approximately 174.5 acres of land in Vero Beach, Florida (Vero Beach property), from the General Development Corporation (General), which was the debtor in possession of that property. General provided financing to OIP for that purchase in the amount of $367,500 and retained a purchase money mortgage on the Vero Beach property with respect to that loan. After debits and credits reflected in the closing statement with respect to the purchase of the Vero Beach property, the balance due from OIP to General was $66,000. That amount was paid by a $66,000 check drawn on the escrow account, signed by Mr. Hefferan, and dated December 11, 1990.

On December 20, 1990, OIP purchased for $3 million an apartment complex in Fort Worth, Texas (Quail Ridge property), from American National Insurance Company (American National). American National provided financing to OIP for that purchase in the amount of $2,888,000 and retained a mortgage on the Quail

Ridge property with respect to that loan. After debits and credits reflected in the closing statement with respect to the purchase of the Quail Ridge property, the balance due from OIP to American National was $482,521.48. The check signed by Mr. Hefferan and dated December 20, 1990, which was drawn on the escrow account in order to pay that amount due, was for $490,000. The portion of that $490,000 check that was not used to pay the balance due on the purchase of the Quail Ridge property, i.e., $7,478.52, was not redeposited into the escrow account.

Mr. Kaplan, the president of Xway, was aware that Mr. Canty contemplated structuring the sales by OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15 so as to qualify for like-kind exchange treatment under section 1031. Mr. Kaplan believes that at approximately the time of those sales, and probably within 45 days after those sales, Mr. Canty made him generally aware of properties that Mr. Canty was interested in purchasing, including the properties in Vero Beach, Florida, and in Texas that were ultimately purchased with a portion of the escrow fund. However, the escrow agreement did not identify any particular property to be purchased thereunder and did not identify what portion of the escrowed sales proceeds was to be used to purchase such property and what portion was to remain as boot under section 1031. Moreover, although the escrow agreement required OIP to identify within 45 days after July 26, 1990, any property that it wanted Interstate to acquire pursuant to the

escrow agreement (replacement property) by notifying Interstate in writing of the identity of any such property, OIP did not comply with that requirement.

Although the escrow agreement required Interstate, upon identification by OIP of a replacement property, to execute with the owner of such property an assignable contract to purchase it (provided that Interstate's total potential liability on default under such a contract did not exceed an amount payable with respect to such property that was equal to the "Agreed Amount" as defined in paragraph 5(e) of the escrow agreement), Interstate did not comply with that requirement with respect to at least three of the four replacement properties that were ultimately purchased by OIP with a portion of the escrow fund. Instead, OIP acquired at least those three properties through preexisting contracts in its own name or without any contract at all.

The escrow agreement did not permit any withdrawals to be made from the escrow fund except (1) to pay for any replacement property acquired by OIP; (2) to pay OIP the "Agreed Amount" as defined in paragraph 5(e)(1) of the escrow agreement within three business days after Interstate received written notice from OIP that OIP did not identify all or any of the replacement property within 45 days after July 26, 1990;[5] (3) to pay OIP no later than

---

[5]The escrow agreement required such written notice by OIP to Interstate to be made at any time after the expiration of that 45-day period.

five business days after the expiration of the 180-day period after July 26, 1990, any portion of the "Agreed Amount" as defined in paragraph 5(e)(2) of the escrow agreement that had not been expended by Interstate within that 180-day period for the purchase of replacement property or that had not previously been paid to OIP pursuant to paragraph 5(d)(1) of the escrow agreement relating to OIP's failure to identify all or any of the replacement property within 45 days after July 26, 1990; and (4) to pay any remaining portion of the escrow fund to Interstate within five days after the expiration of the 180-day period after July 26, 1990.  Nonetheless, after the expiration of the 45-day period after July 26, 1990, and before the expiration of the 180-day period after that date, a check in the amount of $50,000, which was signed by John Hefferan, payable to OIP, and dated November 26, 1990, was drawn on the escrow fund.  The purpose for that withdrawal as stated on that check was "Draw Re:  Canty".  In addition, a check in the amount of $50,000, which was signed by John Hefferan, payable to Canti Carriage Company, and dated December 11, 1990, was drawn on the escrow fund.  The purpose for that withdrawal as stated on that check was "Draw".  Although the $50,000 check payable to Canti Carriage Company was signed by John Hefferan, Mr. Canty wrote both the name of the payee and the amount on that check.  Furthermore, on January 8, 1991, OIP received a distribution of $12,740.10 from the escrow fund, which comprised all the moneys remaining in that fund as of that date.

In addition to writing the name Canti Carriage Company and the amount on the check in the amount of $50,000 dated December 11, 1990, which was drawn on the escrow fund, Mr. Canty wrote in the name of the payee on at least several other checks drawn on the escrow account and presented those checks to Mr. Hefferan for his signature. Mr. Canty also reviewed and balanced the bank statements issued by the Bank with respect to the escrow account.

The general ledger of OIP contained entries relating to the escrow fund, including entries relating to the interest credited monthly to that fund and belonging to Interstate pursuant to paragraph 2 of the escrow agreement. The following entries were made in OIP's general ledger with respect to the escrow fund:

```
0001106      Escrow Funds Rec.-I Park Sale Asset
07/26/90 GL00043 Record Starker Sale of I    GL   1,023,626.00
                 Park Land
07/27/90 GL00043 Purchase of BAD from Esc.   GL     200,000.00CR
                 Funds
07/31/90 GL00044 Interest Income I-4 Escrow  GL         902.60
08/31/90 GL00044 Interest Income I-4 Escrow  GL       5,602.27
09/28/90 GL00044 Interest Income I-4 Escrow  GL       5,458.39
10/05/90 GL00044 Interest Income I-4 Escrow  GL         915.71
10/23/90 GL00043 Deposit for purchase of QFW GL      50,000.00CR
                 from Escrow
10/23/90 GL00045 Am. Natnl-Consid. for       GL          50.00CR
                 Contract fr Escrow
11/05/90 GL00044 Interest Income I-4 Escrow  GL       5,530.07
11/20/90 GL00045 Purchase 3822 Bainbridge-   GL     125,000.00CR
                 From Escrow
11/26/90 GL00045 Dist of Excess funds from   GL      50,000.00CR
                 I-4 Escrow
12/05/90 GL00044 Interest Income I-4 Escrow  GL       4,670.58
12/11/90 GL00045 Dist of Excess I Park Esc   GL      50,000.00CR
                 Funds to OIP
12/11/90 GL00045 Record Purchase of Vero     GL      70,640.50CR
                 from Esc Funds
12/20/90 GL00043 Purchase of QFW from Esc.   GL     490,000.00CR
                 Funds
01/04/91 GL00044 Interest Income I-4 Escrow  GL       1,724.98
01/08/91 GL00046 Final Dist I-4 Escrow-Dist  GL      12,740.10CR
                 Excess Funds
Totals for Account Number 0001106
         .00   1,048,430.60   1,048,430.60  .00            .00
```

In Schedule D of petitioners' consolidated return for the taxable year ended February 28, 1991, petitioners reported and recognized aggregate gains in the amount of $234,360 from the sales by OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15. Those reported gains were considered by petitioners to be boot under section 1031.

Claimed Section 1033 Real Estate Transaction

During petitioners' taxable year ended February 28, 1991, OIP owned a 50-percent interest in a partnership known as

Sandlake Executive Center (Sandlake), and Sandlake owned an 80-percent interest in a partnership known as Chancelor Concourse Joint Venture (CCJV). CCJV had been formed to purchase, develop, and sell a particular parcel of real property. Around June or July 1990, the Orange County School Board and Orange County, Florida, condemned the real property owned by CCJV (CCJV real property), and OIP received certain cash proceeds (condemnation proceeds) as a result of that condemnation.

The terms of a document entitled "Warranty Deed", which bears the date of February 28, 1992, was signed by Mr. Canty as president of OIP, and was recorded on September 10, 1993 (recorded Vero Beach property warranty deed), recite that OIP was transferring the Vero Beach property to FIIC for $10 and other valuable consideration.[6] That document also recites that $2,520 in document stamps was paid to the State of Florida with respect to the transfer recited in that document. Based on the amount of such document stamps, the value of the Vero Beach property for Florida document stamp purposes was $360,000.

The terms of a document entitled "Assumption of Obligations Under Promissory Note and Mortgage Deed", which also bears the date of February 28, 1992, was signed by Mr. Canty as president of FIIC, and was never recorded, recite that FIIC agreed (1) to

[6]As discussed above, OIP had purchased the Vero Beach property on Dec. 11, 1990. Petitioners claim that OIP acquired that property on that date as part of a like-kind exchange under sec. 1031.

be bound by the promissory note in the amount of $367,500 and the purchase money mortgage with respect to that note that OIP had executed in favor of General on December 11, 1990, when OIP had acquired the Vero Beach property, and (2) "to meet the obligations created thereby and does hereby release and hold harmless OIP from any and all liability associated therewith."

The terms of a document entitled "Warranty Deed", which also bears the date of February 28, 1992, was signed by Mr. Canty as president of FIIC, and was never recorded, recite that FIIC was transferring the Vero Beach property to IRF, one of FIIC's wholly owned subsidiaries, for $10 and other valuable consideration. As of February 28, 1991, IRF had assets of $96.

The terms of a document entitled "Quit-Claim Deed", which bears the date of January 20, 1994, was signed by Mr. Canty as president of IRF, and was never recorded (IRF quitclaim deed document), recite that IRF

> in consideration of the sum of $950,000.00 * * * does
> hereby * * * quitclaim unto [OIP] * * * all the right,
> title, interest, claim and demand which [IRF] * * * has
> in * * * all of government lot three, lying in section
> 29, township 33, range 40 east, Indian River County,
> Florida.

The government lot three referred to in the IRF quitclaim deed document consisted of approximately 34.3 acres (34.3-acre parcel of the Vero Beach property) of the approximately 174.5-acre Vero Beach property which OIP had acquired from General on December 11, 1990. There is no road access to the 34.3-acre parcel of the

Vero Beach property, which is bounded on the eastern side by the Indian River and is landlocked on the remaining three sides.

The terms of the IRF quitclaim deed document state that the consideration of $950,000 recited therein was to be evidenced by a purchase money note and a mortgage in that amount, which also were to bear the date of January 20, 1994. The terms of a document entitled "NOTE" (OIP note), which also bears the date of January 20, 1994, was signed by Mr. Canty as president of OIP, and was never recorded, recite that OIP promised to pay IRF $950,000 on a date that is 36 months after January 20, 1994, "with interest after maturity at the rate of 8 per cent per annum until paid". The terms of a document entitled "This Indenture", which also bears the date of January 20, 1994, was signed by Mr. Canty as president of OIP, and was never recorded, recite that OIP, as mortgagor, "for and in consideration of * * * nine hundred fifty thousand Dollars * * * has granted, bargained and sold to the * * * Mortgagee [IRF]" the 34.3-acre parcel of the Vero Beach property as security for the payment of the OIP note.

Except as described above with respect to the $2,520 in document stamps that the recorded Vero Beach property warranty deed recites was paid to the State of Florida, no Florida transfer tax or Florida intangibles tax was paid with respect to the various transactions and indebtedness among OIP, FIIC, and/or IRF that were recited in the above-described documents regarding the Vero Beach property and regarding the 34.3-acre parcel of the

Vero Beach property. Nor was any real estate tax paid as of October 4, 1994, on the Vero Beach property for any of the years 1990, 1991, 1992, and 1993.

During the examination in 1993 by respondent of petitioners' consolidated returns for the years at issue, Mr. Canty informed respondent's examining agent that no replacement property had yet been purchased with respect to the condemnation proceeds that OIP received as a result of the condemnation of the CCJV real property.

Around October 4, 1994, CCC, one of FIIC's subsidiaries which was engaged in auto sales during the years at issue, used the Vero Beach property as collateral with respect to a loan that it was seeking from the Bank.

In December 1994, Mr. Canty, as president of OIP and IRF, contracted to have an appraisal done of the 174.5-acre Vero Beach property and approximately 54 acres of land adjacent to that property consisting of three parcels (54-acre real property). The property appraised had approximately 1¼ miles of waterfront on the Indian River and approximately 2,000 feet of frontage on U.S. Highway 1. In a report dated December 15, 1994, the appraiser concluded that the highest and best use for the property appraised was "future residential development or as an alternative highest and best use as [sic] for conservation." In describing the 54-acre real property, the appraiser stated:

The owner of the subject property has under contract three parcels of land that abut the original 174.5 acres [Vero Beach property] to the west.  These parcels under contract make up the balance of the 228.05 acres of the subject property and are considered to be crucial attributes of the subject property by which the acquisition of this property will provide additional upland acreage, increased ingress and egress to the eastern portion of the subject and frontage for future commercial development on U.S. Highway One.  Two of three parcels have disclosure provisions within the contract which prevent the buyer or seller from disclosing information such as price, terms or closing date etc. * * * The third parcel of land under contract is from J.C. Enterprises, Inc. (Grantor) to Indian River Farms, Inc. (Grantee) for $552,000 cash to the seller.  This parcel has frontage on U.S. Highway One and contains approximately 8.51 acres or 370,695 square feet.  This parcel like the other two parcels is zoned RM-6 by Indian River County allowing residential development at a maximum density of six units per acre.  The sales price results in a value per acre of $64,864 or $10,823 per unit.

The appraiser estimated that the "as is" value of the appraised property as proposed to be developed was $10,250,000.

On September 19, 1994, Atlantic Gulf Communities sent a letter to OIP as the borrower of the loan that General had made to OIP on December 11, 1990, in order to finance in part OIP's acquisition from General of the Vero Beach property.  That letter stated in pertinent part:  "The following information is provided to you pursuant to your request of September 19, 1994 for payoff information".

Petitioners reflected the condemnation of the CCJV real property and the receipt by OIP of the condemnation proceeds (collectively, the condemnation transaction) in both their books and records and their consolidated return for the taxable year

ended February 28, 1991, as the elimination of OIP's 50-percent interest in Sandlake and the realization by OIP of a deferred gain under section 1033 in the amount of $819,566.

Notice of Deficiency

In the notice of deficiency (notice) issued to petitioners, respondent determined, inter alia, that the aggregate gains realized by OIP, and not just the boot reported by petitioners, on its sales of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15 during the taxable year ended February 28, 1991, must be recognized and included in petitioners' consolidated return for that year because those gains do not qualify for nonrecognition treatment under section 1031. Respondent also determined in the notice that the gain realized by OIP as a result of the condemnation transaction must be recognized and included in petitioners' consolidated return for the taxable year ended February 28, 1991, because that gain does not qualify for nonrecognition treatment under section 1033.

Respondent further determined in the notice, inter alia, that petitioners are liable for all the taxable years at issue except the taxable year ended February 28, 1993, (1) for additions to tax under section 6651(a)(1) for failure to file timely their consolidated returns for those years and (2) for accuracy-related penalties under section 6662(a) because of negligence or disregard of rules and regulations.

OPINION

Petitioners bear the burden of proving that the determinations in the notice are erroneous. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

<u>Claimed Section 1031 Real Estate Transactions</u>

Petitioners claim that, except for the boot which they recognized in their consolidated return for the taxable year ended February 28, 1991, they are entitled to nonrecognition treatment under section 1031 with respect to the aggregate gains realized during that taxable year as a result of OIP's disposition of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15. Respondent counters that the record does not support petitioners' position.[7]

Section 1031 provides in pertinent part:

> (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind.--
>
> > (1) In general.--No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.
>
>     *      *      *      *      *      *      *
>
> > (3) Requirement that property be identified and that exchange be completed not more than 180 days after transfer of exchanged property.--For

___

[7]We note that the parties do not rely on sec. 1.1031(k)-1, Income Tax Regs., in advancing their respective positions under sec. 1031. In general, those regulations are effective for transfers of property occurring on or after June 10, 1991. See sec. 1.1031(k)-1(o), Income Tax Regs.

purposes of this subsection, any property received by the taxpayer shall be treated as property which is not like-kind property if--

(A) such property is not identified as property to be received in the exchange on or before the day which is 45 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(B) such property is received after the earlier of--

(i) the day which is 180 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(ii) the due date (determined with regard to extension) for the transferor's return of the tax imposed by this chapter for the taxable year in which the transfer of the relinquished property occurs.

Transactions that take the form of a cash sale and reinvestment cannot, in substance, qualify as an exchange under section 1031, even though the end result may be the same as a reciprocal exchange of properties. See Bell Lines, Inc. v. United States, 480 F.2d 710, 714 (4th Cir. 1973); Carlton v. United States, 385 F.2d 238, 241 (5th Cir. 1967). As we indicated in Barker v. Commissioner, 74 T.C. 555, 561 (1980),

The "exchange" requirement [under section 1031] poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Bell Lines, Inc. v. United States, 480 F.2d 710, 711 (4th Cir. 1973). Yet, if the

exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, Starker v. United States, 602 F.2d 1341, 1352 (9th Cir. 1979).

Petitioners argue (1) that the four properties acquired by OIP (i.e., the Brentwood property, Mr. Canty's residence, the Vero Beach property, and the Quail Ridge property) are like-kind properties within the meaning of section 1031(a) and (2) that those properties (a) were identified, as required by section 1031(a)(3)(A), within 45 days after OIP disposed of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15 and (b) were acquired within the time prescribed by section 1031(a)(3)(B). According to petitioners, OIP's disposition of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15 and its acquisition of those four properties were steps in an integrated transaction, the substance of which was an exchange of properties qualifying under section 1031. In support of that position, petitioners rely on cases involving multiparty transactions which the courts have characterized as exchanges under section 1031, including Biggs v. Commissioner, 632 F.2d 1171 (5th Cir. 1980), affg. 69 T.C. 905 (1978); W.D. Haden Co. v. Commissioner, 165 F.2d 588 (5th Cir. 1948), affg. on this issue a Memorandum Opinion of this Court dated Apr. 9, 1946; Garcia v. Commissioner, 80 T.C. 491 (1983); and Barker v. Commissioner, supra.

Respondent does not dispute that the Brentwood property, the Vero Beach property, and the Quail Ridge property are like-kind

properties within the meaning of section 1031(a). Respondent contends, however, that Mr. Canty's residence does not qualify as like-kind property within the meaning of section 1031(a).[8] Respondent also disputes that the four properties acquired by OIP were identified within the time prescribed by section 1031(a)(3)(A). Although respondent acknowledges that "Petition-ers did attempt to structure their July 26, 1990 sales of real property to take the form of a Section 1031 like-kind exchange", respondent maintains that "the substance of those transactions shows that they do not qualify for Section 1031 treatment." Respondent also argues that the cases relied on by petitioners involving multiparty transactions are distinguishable from the present case in that the record in the present case "does not show any single, integrated plan at the time of the July 26, 1990" disposition by OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15. Moreover, according to respondent,

> Unlike the situations in Garcia, Barker, and Haden, petitioners here had effective control over the sales proceeds. The sales proceeds were subject to the control of Canty's longtime friend and attorney, Heffernan [sic]. * * * Heffernan [sic] wrote checks to

---

[8]According to respondent,

petitioners' [sic] attempt to stretch Section 1031 to cover the "purchase" of Canty's home. The property petitioners sold were commercial real estate lots. * * * Canty continued to live in the home after the purchase, and did not pay rent to petitioners. * * * This transaction appears to be more of another draw to Canty than an acquisition of real estate for investment purposes.

Canty from the proceeds. * * * Rather than an exchange, the transaction was a sale with the proceeds put into an account subject to Canty's control.

On the instant record, we reject for various reasons discussed below petitioners' position that they are entitled to nonrecognition treatment under section 1031 with respect to the gains at issue. First, on that record, we find that petitioners have failed to establish that Mr. Canty's residence qualifies as like-kind property under section 1031(a). Mr. Canty testified that OIP acquired that residence in order to establish a rental operation consisting of single-family residential units in southeast Orlando, Florida. Based on our observation of Mr. Canty's demeanor, we have reservations about his credibility. Moreover, we have found that Mr. Canty continued to live rent free in his residence after OIP acquired it on November 20, 1990, and that OIP acquired no other residential properties during the early 1990's. We are not required to, and we shall not, rely on Mr. Canty's uncorroborated testimony about the reason for OIP's acquisition of Mr. Canty's residence, which testimony serves the interests of petitioners. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Second, on the instant record, we find that petitioners have failed to establish that OIP identified within 45 days after July

26, 1990, as required by section 1031(a)(3)(A), three of the four properties that it ultimately acquired with a portion of the escrow fund (i.e., Mr. Canty's residence, the Vero Beach property, and the Quail Ridge property) as properties to be received by OIP, along with the Brentwood property, in exchange for lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15. As for the Brentwood property, OIP acquired that property on July 27, 1990, the day after the sales of the real estate interests in question were effected. We conclude that that property was timely identified as required by section 1031(a)(3)(A).

To support their position that OIP complied with section 1031(a)(3)(A), petitioners rely on (1) Mr. Canty's testimony that, prior to July 26, 1990, the date on which OIP sold the real estate interests in question and on which the escrow agreement was entered into, he notified Mr. Kaplan, the president of Xway who did not testify at the trial in this case, of the identity of all of the properties that OIP ultimately acquired with a portion of the escrow fund and (2) the parties' stipulation that Mr. Kaplan believes that at approximately the time of the sales by OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15, and probably within 45 days thereafter, Mr. Canty made Mr. Kaplan generally aware of properties that Mr. Canty was interested in purchasing, including the properties in Vero Beach, Florida, and Texas that were ultimately purchased with a portion of the escrow fund.

With respect to Mr. Canty's testimony on which petitioners are relying, as we stated above, we have reservations about his credibility. Moreover, Mr. Canty's testimony that he notified Mr. Kaplan prior to July 26, 1990, of the identity of the properties that OIP intended to acquire with the escrowed sales proceeds is belied by the escrow agreement itself. That agreement recited that as of July 26, 1990, OIP was "in the process of identifying a parcel or parcels of real property to be acquired". In addition, the escrow agreement did not identify any particular property to be purchased thereunder and did not identify what portion of the escrowed sales proceeds would be used to purchase such property and what portion would remain as boot under section 1031. Furthermore, although the escrow agreement required OIP to identify within 45 days after July 26, 1990, any property that it wanted Interstate to acquire pursuant to the escrow agreement by notifying Interstate in writing of the identity of any such property, OIP did not comply with that requirement. We are not required to, and we shall not, rely on Mr. Canty's uncorroborated testimony that, prior to July 26, 1990, he informed Mr. Kaplan of the identity of the properties to be received by OIP in exchange for lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15, which testimony serves the interests of petitioners. See Lerch v. Commissioner, supra; Geiger v. Commissioner, supra; Tokarski v. Commissioner, supra.

With respect to the parties' stipulation on which petitioners are relying, we find that stipulation to be vague, general, and inconclusive in establishing that OIP complied with section 1031(a)(3)(A). That stipulation merely shows that Mr. Kaplan believes that at approximately the time of the sales by OIP of the real estate interests in question, and probably within 45 days thereafter, Mr. Canty made Mr. Kaplan generally aware of properties that he was interested in purchasing including, but not limited to, the properties that were ultimately purchased with a portion of the escrow fund. In this connection, it is noteworthy that Mr. Canty, who negotiated all real estate transactions on behalf of the various petitioners involved in real estate investment, testified that, as a negotiating tactic, he sometimes intentionally stalled the closing of real property on which a real estate contract had been signed in order to attempt to lower the purchase price. As far as Mr. Canty was concerned, his negotiations on real estate transactions on behalf of OIP and other petitioners were not final until a real estate deal was actually closed.

Third, on the record before us, we find that petitioners have failed to show that OIP, acting through its president Mr. Canty, did not have control over the escrowed sales proceeds. See Coupe v. Commissioner, 52 T.C. 394, 409 (1969) ("The statute [section 1031] only requires that as the end result of an agreement, property be received as consideration for property trans-

ferred by the taxpayer without his receipt of, or control over, cash."). On that record, we further find that although the terms of the escrow agreement imposed controls on OIP's access to the escrowed sales proceeds prior to the expiration of 180 days after July 26, 1990, Mr. Hefferan violated those terms and permitted Mr. Canty, acting on behalf of OIP, to control the disbursement of those proceeds prior to the expiration of that 180-day period for purposes other than the acquisition of replacement property. Consequently, the present case is distinguishable from the cases on which petitioners are relying involving taxpayers who did not receive, or have control over, cash in multiparty transactions that the courts characterized as exchanges under section 1031.

To support their position that OIP did not have control over the escrowed sales proceeds, petitioners rely on the testimony of Mr. Hefferan and "his clear fiduciary obligations under the ethical canons of the Florida Bar." Although Mr. Hefferan (1) signed the escrow agreement as Interstate's trustee, (2) testified that he understood his position under the escrow agreement to be that of Interstate's trustee, and (3) had fiduciary obligations to Interstate as Interstate's trustee, we find certain of Mr. Hefferan's actions with respect to the escrow fund and the escrow agreement to be inconsistent with the terms of that agreement.

The record establishes that Mr. Hefferan had no recollection of ever consulting with Mr. Kaplan, Xway's president, or any

other representative of Xway or Interstate regarding disbursements from the escrow fund or any other matter relating to that fund or the escrow agreement and that all Mr. Hefferan's contacts regarding those matters were with Mr. Canty. The record also shows that Mr. Hefferan's actions with respect to the escrow fund and the escrow agreement complied with the wishes of Mr. Canty, regardless whether those actions violated certain provisions of that agreement.

To illustrate, the terms of the escrow agreement did not permit any withdrawals to be made from the escrow fund except (1) to pay for any replacement property acquired by OIP; (2) to pay OIP the "Agreed Amount" as defined in paragraph 5(e)(1) of the escrow agreement within three business days after Interstate received written notice from OIP that OIP did not identify all or any of the replacement property within 45 days after July 26, 1990; (3) to pay OIP no later than five business days after the expiration of the 180-day period after July 26, 1990, any portion of the "Agreed Amount" as defined in paragraph 5(e)(2) of the escrow agreement that had not been expended by Interstate within that 180-day period to purchase replacement property or that had not previously been paid to OIP pursuant to paragraph 5(d)(1) of the escrow agreement relating to OIP's failure to identify all or any of the replacement property within 45 days after July 26, 1990; and (4) to pay any remaining portion of the escrow fund to Interstate within five days after the expiration of the 180-day

period after July 26, 1990.  The record does not disclose that, pursuant to paragraph 5(d)(1) of the escrow agreement, OIP gave written notice to Interstate subsequent to the expiration of the 45-day period after July 26, 1990, that it did not identify all or any of the replacement property within that 45-day period. Nonetheless, in violation of the terms of the escrow agreement, after the expiration of that 45-day period and before the expiration of the 180-day period after July 26, 1990, the following withdrawals were authorized by Mr. Hefferan and made from the escrow fund, which were not used to acquire a replacement property:  Mr. Hefferan signed a $50,000 check drawn on the escrow account, payable to OIP, and dated November 26, 1990.  The purpose for that withdrawal as stated on that check was "Draw Re: Canty".  Mr. Hefferan signed a $50,000 check drawn on the escrow account, payable to Canti Carriage Company, and dated December 11, 1990.  The purpose for that withdrawal as stated on that check was "Draw".[9]  On December 20, 1990, Mr. Hefferan signed a $490,000 check drawn on the escrow account which was to be used to pay the $482,521.48 balance due with respect to OIP's acquisition of the Quail Ridge property after debits and credits reflected in the closing statement.  The portion of that $490,000 check which was not used to pay that amount due, i.e., $7,478.52,

---

[9]Although the $50,000 check payable to Canti Carriage Company was signed by John Hefferan, Mr. Canty wrote both the name of the payee and the amount on that check.

was not redeposited into the escrow account. On January 8, 1991, OIP received a distribution of $12,740.10 from the escrow fund, which was all the moneys remaining in that fund as of that date. In addition, on July 27, 1990, even prior to the expiration of the 45-day period after July 26, 1990, Mr. Hefferan authorized a $200,000 wire transfer drawn on the escrow account which was to be used to pay the $170,688.17 balance due with respect to OIP's acquisition of the Brentwood property after debits and credits reflected in the closing statement. The portion of that $200,000 wire transfer that was not used to pay that amount due, i.e., $29,311.83, was not redeposited into the escrow account. In summary, in violation of the terms of the escrow agreement, prior to the expiration of 180 days after July 26, 1990, Mr. Hefferan authorized withdrawals from the escrow fund totaling $149,530.45, which were paid to OIP, to OIP's affiliate CCC, or otherwise not used to acquire a replacement property pursuant to the escrow agreement.[10]

_____

[10]Other examples of noncompliance with the terms of the escrow agreement to which Mr. Hefferan acquiesced include the following: Although the escrow agreement required OIP to identify within 45 days after July 26, 1990, any replacement property that it wanted Interstate to acquire pursuant to the escrow agreement by notifying Interstate in writing of the identity of any such property, OIP did not comply with that requirement. In addition, although the escrow agreement required Interstate, upon identification by OIP of replacement property, to execute with the owner of such property an assignable contract to purchase such property (provided that Interstate's total potential liability on default under such a contract did not exceed an amount payable with respect to such property that was equal to the
(continued...)

Petitioners contend that the foregoing withdrawals subsequent to the expiration of the 45-day period after July 26, 1990, and prior to the expiration of the 180-day period after that date were permissible under paragraph 5(d)(1) of the escrow agreement.[11]  That is because, according to petitioners, that paragraph "could reasonably be interpreted" to permit Mr. Hefferan as Interstate's trustee to disburse any funds that were not necessary to acquire replacement property to OIP at its election after the expiration of 45 days after July 26, 1990.  We disagree and reject petitioners' construction of paragraph 5(d)(1) of the escrow agreement as an unreasonable interpretation of that paragraph.  Paragraph 5(d)(1) of the escrow agreement provided:

> (d)  <u>Disposition of Funds If Some or All Like Kind Properties Are Not Acquired.</u>  In the event that the non simultaneous like kind exchange of the Exchange Property contemplated hereunder is not consummated in whole or in part in accordance with the provisions of this paragraph 5, Buyer and Exchangor agree that the Escrow Agent shall distribute the Escrow Fund as follows:

---

[10](...continued)
"Agreed Amount" as defined in paragraph 5(e) of the escrow agreement), Interstate did not comply with that requirement with respect to at least three of the four replacement properties that were ultimately purchased by OIP with a portion of the escrow fund.  Instead, OIP acquired at least those three properties through preexisting contracts in its own name or without any contract at all.

[11]Petitioners do not address the withdrawal of $29,311.83 on July 27, 1990, before the expiration of the 45-day period after July 26, 1990, that was supposed to have been, but was not, used to purchase the Brentwood property.

(1)  In the event Exchangor does not identify all or any of the Like Kind Property within the forty-five (45) day period referred to in (a) above, then Exchangor shall notify Buyer in writing at any time after the expiration of such forty-five (45) day period and Buyer, within three (3) business days of receipt of said written notice, shall cause Escrow Agent to pay to Exchangor an amount equal to the Agreed Amount.

It was only in the event that OIP did not identify all or any of the replacement property within 45 days after July 26, 1990, that OIP had the right under that paragraph to notify Interstate in writing at any time after the expiration of that 45-day period, in which event Mr. Hefferan as Interstate's trustee became obligated to pay OIP the "Agreed Amount" as defined in paragraph 5(e)(1) of the escrow agreement within three business days after receipt of such written notice.  In this connection, it is significant that the escrow agreement did not identify what portion of the escrowed sales proceeds was to be used to purchase replacement property and what portion was to remain as boot under section 1031, and the record does not disclose the date after July 26, 1990, on which the parties to the escrow agreement knew what portion of those proceeds would remain as boot under section 1031.

It is also significant that if, as petitioners contend, OIP complied with paragraph 5(a) of the escrow agreement and notified Interstate in writing within 45 days after July 26, 1990, of the identity of all four of the properties that it ultimately acquired with a portion of the escrow fund, it would not have been

entitled under paragraph 5(d)(1) of the escrow agreement to give written notice to Interstate after that 45-day period that it did not identify all or any of the replacement property and Interstate would not have been obligated to pay OIP within three business days after having received such notice the "Agreed Amount" as defined in paragraph 5(e)(1) of that agreement. Instead, OIP would have been required to wait until the expiration of the 180-day period after July 26, 1990, in order to have been entitled to receive no later than five days thereafter any moneys remaining in the escrow fund to which it was entitled under paragraph 5(d)(2) of the escrow agreement.[12]

Based on our examination of the entire record in this case, we find that petitioners have failed to establish that they are entitled to nonrecognition treatment under section 1031 with respect to the aggregate gains at issue that were realized on the disposition by OIP of lots 11 and 12 and OIP's 25-percent interests in lots 14 and 15. Accordingly, we sustain respondent's determination with respect to those gains.

Claimed Section 1033 Real Estate Transaction

The sole dispute between the parties is whether the alleged purchase by OIP from IRF of the 34.3-acre parcel of Vero Beach

---

[12]If, as we have found, OIP did not comply with par. 5(a) of the escrow agreement and did not identify in writing all or any of the replacement property within 45 days after July 26, 1990, it would have been required to give written notice to Interstate after that 45-day period. However, no such written notice is in the record.

property on January 20, 1994, should be recognized for purposes of determining whether petitioners are entitled to nonrecognition treatment under section 1033 with respect to the condemnation proceeds that OIP received. Respondent contends that the record shows that there was no valid nontax business reason for the alleged purchase by OIP from IRF and that that alleged purchase "was not bona fide, but was a sham transaction for tax purposes." In support of that contention, respondent maintains, inter alia, that there was no valid nontax business reason for the purported transfers of the Vero Beach property by OIP to FIIC and by FIIC to IRF; those purported transfers also were sham transactions for tax purposes; the deed relating to the alleged sale by IRF to OIP of the 34.3-acre parcel of the Vero Beach property was not recorded, nor was the deed relating to the alleged transfer by FIIC to IRF recorded; OIP allegedly paid $950,000 for the 34.3-acre parcel of the Vero Beach property, through issuance of a note, which was "264% of the cost of the larger parcel [the entire 174.5-acre Vero Beach property] four months earlier", when the deed was recorded purportedly transferring the entire Vero Beach property from OIP to FIIC for only $360,000, the value of that entire property based on the amount of Florida document stamps paid; no Florida intangibles tax or Florida transfer tax was paid with respect to the purported transfer of the Vero Beach property from FIIC to IRF or with respect to the purported transfer by IRF to OIP of the 34.3-acre parcel of the Vero Beach

property; and the Vero Beach property was used around October 1994 as security for a loan to CCC, an affiliate of OIP, which shows that the various members of petitioners' consolidated group were not kept separate.

Petitioners claim that OIP transferred the Vero Beach property to FIIC in order to protect that property from the creditors of OIP. Petitioners also contend that OIP transferred the Vero Beach property to FIIC and that FIIC transferred it to IRF in contemplation of IRF's using that property in a joint venture with another entity. In that regard, petitioners assert that "joint venture partners and lending banks required the use of discrete entities to hold development properties, such as IRF, for bankruptcy protection and other reasons." According to petitioners, "the anticipated joint venture never came to pass", and consequently IRF transferred the 34.3-acre parcel of the Vero Beach property to OIP "for a sales price of $950,000, which was paid by a purchase money note secured by a mortgage."

The only evidence in the record with respect to the alleged reasons for the purported transfers of the Vero Beach property from OIP to FIIC and from FIIC to IRF and the purported transfer of the 34.3-acre parcel of the Vero Beach property from IRF to OIP is the testimony of Mr. Canty, the president of those various corporations. As we indicated above, based on our observation of his demeanor, we have questions about Mr. Canty's credibility. Moreover, other evidence in the record belies his testimony. By

way of illustration, the deed reciting that OIP was transferring the Vero Beach property to FIIC on February 28, 1992, was not recorded until September 10, 1993. Under Florida law, a conveyance of real property will not be effective against the transferor's creditors unless it is recorded. See Fla. Stat. Ann. sec. 695.01(1) (West 1994). The failure to record the deed purportedly transferring the Vero Beach property from OIP to FIIC until almost 19 months after the transfer allegedly took place belies petitioners' contention based on Mr. Canty's testimony that OIP transferred the Vero Beach property to FIIC on February 28, 1992, in order to protect that property from the creditors of OIP. We are not required to, and we shall not, rely on Mr. Canty's uncorroborated testimony about the reasons for the purported transfers in question, which testimony serves the interests of petitioners. See Lerch v. Commissioner, 877 F.2d at 631-632; Geiger v. Commissioner, 440 F.2d at 689-690; Tokarski v. Commissioner, 87 T.C. at 77.

It is also noteworthy that, when OIP allegedly transferred the Vero Beach property to FIIC on February 28, 1992, the only consideration that it purportedly received from FIIC was an agreement by FIIC to be bound by the promissory note in the amount of $367,500 and the purchase money mortgage with respect to that note which OIP had executed in favor of General on December 11, 1990, when OIP acquired the Vero Beach property. The record does not show that FIIC made any payments with respect

to that promissory note, which indicates to us that the purported transfer from OIP to FIIC should not be respected for tax purposes.

In addition, Mr. Canty testified that he believed that the Vero Beach property was worth much more than the $490,000 that OIP paid to acquire it on December 11, 1990. Thus, according to Mr. Canty's own testimony, the alleged transfer by OIP to FIIC of the Vero Beach property on February 28, 1992, must have been for less than that property's fair market value, another indication that that transfer should not be respected for tax purposes.

Finally, we note that petitioners presented no evidence showing that OIP made any payments on the alleged note in the amount of $950,000 that it claims it paid to acquire the 34.3-acre parcel of the Vero Beach property from IRF, another reason supporting respondent's position that that alleged transfer should not be respected for tax purposes.

Based on our examination of the entire record before us, we find that petitioners have failed to show that OIP's alleged purchase of the 34.3-acre parcel of the Vero Beach property on January 20, 1994, should be recognized for purposes of section 1033. Consequently, we sustain respondent's determination with respect to the gain realized by OIP as a result of the condemnation of the CCJV real property.

Addition to Tax Under Section 6651(a)(1)

Respondent determined that petitioners are liable for the addition to tax under section 6651(a)(1) for each of the taxable years at issue except for the taxable year ended February 28, 1993. In support of petitioners' position that respondent's determinations are wrong, petitioners assert only: "Petitioners believe that no additional tax is due and owing, and that therefore no deficiency penalties apply with respect to any year because of the operation of the net operating loss carryover."

We have sustained respondent's determinations in the notice regarding petitioners' consolidated return positions under section 1031 and under section 1033, and petitioners conceded all of the remaining determinations in the notice in the stipulation of settled issues that the parties filed in this case (stipulation of settled issues). On the record before us, we find that petitioners have failed to show that respondent erred in making the determinations in the notice under section 6651(a)(1). Consequently, we sustain those determinations.

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662(a) for each of the taxable years at issue except the taxable year ended February 28, 1993. Petitioners contend that those determinations are wrong because (1) "no additional tax is due and owing, and * * * therefore no accuracy related penalty applies"; (2) "there was substantial authority for the position taken on the consolidated

tax returns"; and (3) "there is a sufficient, uncontroverted basis in the record to conclude that Petitioners relied in good faith on Petitioners' professional return preparer, C.P.A. Clarence Riggs, in taking the positions on Petitioners' returns".

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax resulting from a substantial understatement of income tax. An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, see sec. 6662(d)(2)(A), and is substantial in the case of a corporation if it exceeds the greater of 10 percent of the tax required to be shown or $10,000, see sec. 6662(d)(1)(A) and (B).

The amount of the understatement is reduced to the extent that it is attributable to an item for which there was substantial authority. See sec. 6662(d)(2)(B)(i). In order to satisfy the substantial authority standard of section 6662(d)(2)(B)(i), petitioners must show that the weight of authorities supporting their position is substantial in relation to those supporting a contrary position. See Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. See sec. 1.6662-4(d)(2), Income Tax Regs. A taxpayer may have substantial

authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the relevant facts. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. See sec. 1.6662-4(d)(3)(i), Income Tax Regs.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. See sec. 1.6664-4(b)(1), Income Tax Regs. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error. See Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

We have held above that petitioners have failed to show that they are entitled to nonrecognition treatment under section 1031 and under section 1033. Moreover, petitioners adduced no evidence and make no argument with respect to the various other

determinations in the notice that petitioners conceded in the stipulation of settled issues. Consequently, we reject petitioners' position that respondent's determinations under section 6662(a) are erroneous because there is no additional tax due for any of the taxable years for which respondent determined that petitioners are liable for the accuracy-related penalty under section 6662(a).

On the record before us, we find that petitioners have failed to show that there was substantial authority for the position that they took in the consolidated returns under sections 1031,[13] under section 1033, and with respect to the other determinations in the notice which petitioners conceded.

As for petitioners' claim that they relied on the advice of Mr. Riggs, their return preparer, in taking the positions reflected in the consolidated returns, the record does not establish what specific information petitioners allegedly provided to him. Petitioners did not call Mr. Riggs as a witness. The only evidence regarding petitioners' reliance on Mr. Riggs is the following general and conclusory testimony of Mr. Canty:

> Well, we put everything in a box and we took it over to him. We gave him all the information on the sales that we had and tried to answer all his questions. He took it all in the back room and did whatever they do -- did the books, did the tax returns.

---

[13]As we previously indicated, we find the cases on which petitioners rely to support their position under sec. 1031 to be distinguishable from the present case. Consequently, their reliance on those cases is misplaced.

We are unwilling to rely on the foregoing testimony to establish that there was reasonable cause and that petitioners acted in good faith in taking their consolidated return positions under section 1031, under section 1033, and with respect to the other determinations in the notice which petitioners conceded.

On the record before us, we find that the petitioners have failed to establish any error in respondent's determinations that they are liable for the accuracy-related penalty under section 6662(a) for each of the taxable years at issue except the taxable year ended February 28, 1993.

To reflect the foregoing and the concessions of petitioners,

Decision will be entered for respondent.